UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

In re:                                                    Chapter 11

SANIBEL SUNDIAL PARTNERS, LLC,                            Case No. 9:13-bk-12826-FMD
d/b/a SUNDIAL BEACH AND GOLF RESORT,
a/k/a SUNDIAL BEACH RESORT & SPA,

      Debtor.

_____/

## DEBTOR'S MOTION TO (I) APPROVE MANAGEMENT AGREEMENT AND FOR AUTHORITY TO MAKE PAYMENTS TO MARINER MANAGEMENT SERVICES, LLC AND (II) APPROVE EMPLOYMENT OF MARINER MANAGEMENT SERVICES, LLC FOR ADVISORY SERVICES

SANIBEL SUNDIAL PARTNERS, LLC (the "**Debtor**"), by and through its undersigned counsel, hereby requests the entry of an order approving the Debtor's compliance with the Management Agreement (defined below) including, without limitation, authorizing the Debtor to make payments, as applicable, effective as of the Petition Date, to Mariner Management Services, LLC as required by the Management Agreement, and approving the Debtor's retention of Mariner Management Services as financial advisors with respect to its restructuring efforts. In support of the Motion, the Debtor respectfully represent as follows:

### Jurisdiction and Venue

1.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§157 and 1334. The subject matter of this Motion is a core proceeding pursuant to 28 U.S.C. §157(b). Venue is proper in this district pursuant to 28 U.S.C. §1408.

2.     The statutory predicates for the relief requested herein are Sections 105, 327(a), 328, and 363 of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure.

### Background

3.     On September 26, 2013 (the "**Petition Date**"), the Debtor filed its Voluntary Petition for Relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

4.     The Debtor continues to operate its business and manage its property as debtor in possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code.

5.     No trustee or examiner has been appointed in this Chapter 11 case, and no official committee has been appointed pursuant to §1102 of the Bankruptcy Code.

6.     The Debtor owns and operates an oceanfront beach and golf resort known as the Sundial Beach Resort & Spa (the "**Resort**"), which is by far the largest resort property located on Sanibel Island.[1]  The Resort consists of 406 condominium units (owned by third-party owners), a 38,000 square foot central facilities building housing a lobby and guest reception area, multiple food and beverage outlets, meeting rooms, a spa and fitness center, main pool and pool bar, tennis courts and parking, all located directly on 2,000 feet of private beach on Florida's Gulf Coast.  The Resort has rooms and suites ranging from studios to three bedroom suites and offers a variety of views including garden views and beachfront views.  The Resort completed a major renovation in May 2013.

---

[1] See http://www.sundialresort.com/

2

7.    Approximately 185 of the condominium units are currently enrolled in the resort's hotel lease and rental programs, which generates the significant amount of the Debtor's cash flow.

## Relief Requested and Ground for Relief

8.    Prior to the Petition Date, the Debtor entered into a Management Agreement dated May 2, 2013 (the "**Management Agreement**") with Mariner Management Services, LLC (the "**Mariner**").    A true and correct copy of the Management Agreement is attached hereto as **Exhibit A** and incorporated herein by reference.

9.    Mariner has significant operating experience with the Resort, as Mariner was the very successful owner/operator of the property in the 1990's.  Mariner took over operation in May 2013, and has put in place a highly qualified and experienced management team – some of whom worked at the property during Mariner's earlier ownership.  Mariner has also worked closely with CoreStates Realty, LLC, the Debtor's manager, to devise both the recapitalization plan and a project recovery plan that will utilize the new capital to restore profitable operation of the business.

10.    Under the Management Agreement, Mariner provides services with respect to the Resort and the Rental Program.  The services rendered by Mariner under the Management Agreement are set forth in Section 4.1, with respect to the hotel operations; and Section 4.7, with respect to the rental program.

11.    Pursuant to the Management Agreement, Mariner is paid a monthly fee for its services which is equal to two and one-half percent (2.5%) of the previous month's

gross revenues, an incentive on an annual basis which is equal to twelve percent (12%) of the amount of the profit for such fiscal year, and reimbursement for any out of pocket costs (collectively, the "**Management Fee**"). The Debtor believes that the Management Fee is consistent with the market for the nature and extent of services being performed and is more than reasonable.

12.    By this Motion, the Debtor requests the entry of an order approving the Debtor's compliance with the Management Agreement including, without limitation, authorizing the Debtor to make payments, as applicable, effective as of the Petition Date, to Mariner as required by the Management Agreement.    The compliance with the Management Agreement will be subject to the terms and conditions of the Debtor's post-petition debtor in possession financing facility. Nothing herein should be construed to constitute an assumption of the Management Agreement.

13.    It is necessary for the Debtor to employ a management company to perform the services provided in the Management Agreement.

14.    The Management Company will not continue to provide management services to the Debtor if the Debtor does not perform according to the Management Agreement, including payment of the Management Fee.    Accordingly, it is in the best interest of the estate and all creditors that this Motion be granted.

15.    Also prior to the Petition Date, the Debtor executed an engagement letter (the "**Engagement Letter**"), effective May 1, 2013, with Mariner to provide services in connection with the recapitalization efforts of the Debtor.    A true and correct copy of the Engagement Letter is attached hereto as **Exhibit B** and incorporated herein by reference.

16.     Pursuant to the Engagement Letter, Mariner has agreed to provide the following services (collectively, the "**Services**"):

a.     Review Company status and provide recommendations as to the recapitalization strategy of the business;

b.     Rebuild Company accounting records and systems;

c.     Assist in the development and evaluation of Company cash flow projections and liquidity needs

d.     Assist in the development and evaluation of strategic and financial options for the Company

e.     Assist the Company in assessing creditor issues and negotiating, as needed, with creditors

f.     Assist the Company, if needed, in developing restructuring options including a sale of the Sundial property

g.     Provide advisory services to the Company in developing a Plan of Reorganization, if applicable; and

h.     Perform such other tasks as may be agreed to by Advisor and the Company.

17.     Mariner will provide the Services by Allen G. Ten Broek, Thomas O. Matthews, and Robert Taylor, and will bill based on hourly rates. The hourly rate for Mr. Ten Broek and Mr. Taylor is $500, and $300 for Mr. Matthews, albeit the engagement letter provides that the hourly rates will be discounted 50% by Advisor in support of current Company cash flow constraints.    Fee applications will be based on contemporaneous time records.  In addition, Mariner shall be reimbursed all its travel (including time billed at 50% rates) and out-of-pocket expenses.

18.     The Agreement limits Mariner's liability for damages and provides for the indemnification of liability, except for bad faith, gross negligence, and intentional misconduct. Engagement Letter, p. 2-3.

19.     By this Motion, the Debtor seeks the entry of an order authorizing the Debtor to retain Mariner as financial advisor to perform the Services, and approving the

terms and conditions of the Engagement Letter. The Debtor believes that the retention of Mariner is in the best interest of the Debtor and the estate. Mariner will continue to provide sound financial management support which is necessary to the Debtor, and its efforts in providing the Services are greatly enhanced by the pre-petition and on-going performance of its duties and obligations under the Engagement Letter.

20.    To the best of the Debtor's knowledge, neither Mariner nor its employees have any connection with creditors of the Debtor, other parties in interest, or their respective attorneys. Mariner does not represent any interest adverse to the Debtor or to the estate with respect to the matters upon which it is to be employed by the Debtor.

21.    The Debtor believes that Mariner is disinterested as the term is defined in the Bankruptcy Code. As discussed above, Mariner's only connection with the Debtor is as the manager under the Management Agreement, and in connection with the advisory services provided for in the Engagement Letter.

22.    Bankruptcy Rule 6003 provides that, except to the extent that relief is necessary to avoid immediate and irreparable harm, the Court shall not, within twenty-one days after the filing of the voluntary petition, grant relief regarding an application under Bankruptcy Rule 2014. The Debtor submits that absent the approval of the Management Agreement and the employment of Mariner and absent the approval of the Engagement Letter and the retention of Mariner as of the Petition Date, it will suffer immediate and irreparable harm. Therefore, pursuant to Bankruptcy Rule 6003, interim relief is appropriate pending final approval of this Application. Consequently, the Debtor

requests that the Court enter an interim order granting this Motion, and conduct a final hearing on the Motion after the expiration of the twenty-one day period.

WHEREFORE, the Debtor respectfully requests that the Court enter an order granting this Motion, approving the Management Agreement, authorizing the Debtor to pay the Management Fee effective as of the Petition Date to the Mariner, approving the Engagement Letter and authorizing the Debtor to retain Mariner as financial advisor with respect to the Services, authorizing the Debtor to compensate Mariner for services rendered and reimburse costs under the Engagement Letter following application to and approval by the Court, and providing such other and further relief as the Court deems appropriate.

Dated:  September 26, 2013

/s/ Daniel R. Fogarty
Russell M. Blain (FBN 236314)
Stephen R. Leslie (FBN 000349)
Daniel R. Fogarty (FBN 0017532)
Stichter, Riedel, Blain & Prosser, P.A.
110 E. Madison Street - Suite 200
Tampa, Florida 33602
Telephone: (813) 229-0144
Facsimile: (813) 229-1811
Email: rblain@srbp.com
      sleslie@srbp.com
      dfogarty@srbp.com
Attorneys for Debtor

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the Debtor's Motion to (i)

Approve Management Agreement and for Authority to Make Payments to Mariner

Management Services, LLC and (ii) Approve Employment of Mariner Management

Services, LLC for Advisory Services has been furnished on this 26th day of September,

2013, by either the Court's CM/ECF electronic noticing system or by U.S. Mail to:

Office of the United States Trustee
20 Largest Unsecured Matrix


*/s/ Daniel R. Fogarty*
Daniel R. Fogarty

Anthony Brunsing
P.O. Box 68
Lake View, NY 14085

Beverly J. Kuperman
9 Sterling Forest Lane
Suffern, NY 10901

Carl Neumann
16949 Imperial Circle
Naperville, IL 60563

CoreStates Realty Group, LLC
c/o Casla Partners LP
154 Grand St.
New York, NY 10013

Crown Linen
3235 NW 62nd Street
Miami, FL 33147

David & Mary Beth Cox
20188 N. 1170th Street
Marshall, IL 62441

Delphi Beta Fund
115 Pheasant Run, #112
Newtown, PA 18940

Gary Sweetman
7820 Senrab Drive
Bradenton, FL 34209

Hogan Properties
1000 North 14th Street
Saint Louis, MO 63106

Kenneth & Anne Marnocha
7322 Hunt Club Drive
Zionsville, IN 46077

Launch Interactive
575 Lynnhaven Pkwy, Ste 300
Virginia Beach, VA 23452

Meridian Group
575 Lynnhaven Pkwy, 3rd Floor
Virginia Beach, VA 23452

Paul D. Allen
1181 Oxford Valley Road
Yardley, PA 19067

Ralph Anderson
P.O. Box 966
Bedford, IN 47421

Scott Bridge
7127W. Harness Lane
Columbus, IN 47201

Steve Gordon
314 Highgate Drive
Slingerlands, NY 12159

TravelClick
PO Box 71199
Chicago, IL 60694-1199

Wage Lighting & Design
401 Bustleton Ave.
Feasterville Trevose, PA 19053

William & Mary Taylor
2809 12th Street NW
Waverly, IA 50677

William O'Donnell
391 Grape Hollow Rd.
Holmes, NY 12531

20 Largest Matrix

# EXHIBIT A

# MANAGEMENT AGREEMENT

By and Between

Sanibel Sundial Partners, LLC

and

Mariner Management Services, LLC

DATE

May 2, 2013

GHK050213

# TABLE OF CONTENTS

Page

ARTICLE I .... DEFINITIONS.................................................................. 1

ARTICLE II......... TERM .................................................................... 6

    SECTION 2.1. TERM ......................................................................... 6
    SECTION 2.2. RENEWAL TERMS ........................................................... 6

ARTICLE III  ENGAGEMENT OF MANAGER ...................................... 6

    SECTION 3.1. ENGAGEMENT OF MANAGER TO MANAGE HOTEL................... 6
    SECTION 3.2. MANAGER AS AGENT ...................................................... 6

ARTICLE IV  OPERATION OF THE HOTEL ........................................ 7

    SECTION 4.1. DUTIES OF MANAGER ..................................................... 7
    SECTION 4.2. AUTHORITY OF MANAGER ................................................. 8
    SECTION 4.3. LIMITATIONS OF MANAGER ............................................... 8
    SECTION 4.4. EMPLOYEES ................................................................ 10
    SECTION 4.5. OWNER'S RIGHT OF INSPECTION AND REVIEW ..................... 11
    SECTION 4.6. STANDARDS ................................................................ 11
    SECTION 4.7. RENTAL PROGRAM ........................................................ 11

ARTICLE V  OPERATING EXPENSES PAID BY OWNER...................... 12

    SECTION 5.1. EXPENSES INCURRED BY MANAGER ON BEHALF OF OWNER...... 12
    SECTION 5.2. PROFESSIONAL SERVICES ................................................ 12
    SECTION 5.3. CONTRACTS WITH AFFILIATES .......................................... 12
    SECTION 5.4. REIMBURSABLE EXPENSES .............................................. 12

ARTICLE VI  COMPLIANCE WITH LAWS .......................................... 13

    SECTION 6.1. COMPLIANCE BY MANAGER .............................................. 13
    SECTION 6.2. COMPLIANCE BY OWNER ................................................. 13

ARTICLE VII  AGENCY ACCOUNT, OPERATING FUNDS AND REFURBISHMENT
    RESERVE FUND ............................................................................ 13

    SECTION 7.1. AGENCY ACCOUNT........................................................ 13
    SECTION 7.2. OPERATING FUNDS ....................................................... 13
    SECTION 7.3. PAYMENT OF OPERATING EXPENSES................................... 14
    SECTION 7.4. REFURBISHMENT RESERVE FUND ...................................... 14

ARTICLE VIII  BOOKS, RECORDS AND FINANCIAL STATEMENTS........... 14

    SECTION 8.1. ACCOUNTING SYSTEM .................................................... 14
    SECTION 8.2. FINANCIAL STATEMENTS ................................................. 15
    SECTION 8.3. INITIAL ACCOUNTING RECORDS ........................................ 16

-i-

**TABLE OF CONTENTS**
(continued)

Page

**ARTICLE IX  ANNUAL BUSINESS PLAN** ........................................................................ 16
  Section 9.1.Preparation of Annual Business Plan .......................................... 16
  Section 9.2.Annual Business Plan Disputes ................................................... 17
  Section 9.3.Deviations from Annual Business Plan ....................................... 17

**ARTICLE X  MANAGEMENT FEE AND EXPENSES** ................................................ 18
  Section 10.1.Management Fee ........................................................................... 18
  Section 10.2.Termination Fee ........................................................................... 18
  Section 10.3.Extensive Remodeling .................................................................. 18
  Section 10.4.Reimbursement of Expenses ........................................................ 18

**ARTICLE XI  INSURANCE, DAMAGE AND CONDEMNATION** ............................. 18
  Section 11.1.Insurance ...................................................................................... 18
  Section 11.2.Required Coverage ....................................................................... 19
  Section 11.3.Other Insurance ........................................................................... 19
  Section 11.4.Owner Approval ........................................................................... 19
  Section 11.5.Damage and Repair ..................................................................... 19
  Section 11.6.Condemnation .............................................................................. 20

**ARTICLE XII  TERMINATION** ................................................................................... 21
  Section 12.1.Right of Termination ................................................................... 21
  Section 12.2.Termination Procedure ................................................................ 21
  Section 12.3.Remedies ...................................................................................... 21
  Section 12.4.Payment of Outstanding Fees and Expenses ............................... 21
  Section 12.5.Rebates and Discounts ................................................................. 21
  Section 12.6.Remittance Upon Termination .................................................... 21
  Section 12.7.Additional Transition Obligations .............................................. 22

**ARTICLE XIII  REPRESENTATIONS AND COVENANTS** ........................................ 22
  Section 13.1.Mutual Representations and Warranties ..................................... 22
  Section 13.2.Owner's Representations and Covenants ..................................... 23
  Section 13.3.Manager's Representations and Covenants ................................. 24

**ARTICLE XIV  ASSIGNMENT** .................................................................................... 24
  Section 14.1.Assignment by Owner .................................................................. 24
  Section 14.2.Assignment by Manager .............................................................. 24

**ARTICLE XV  TAXES AND MORTGAGE** .................................................................. 24
  Section 15.1.Taxes ............................................................................................ 24
  Section 15.2.Mortgage ...................................................................................... 24

-ii-

GHK050213

**TABLE OF CONTENTS**
(continued)

Page

**ARTICLE XVI INDEMNIFICATION AND LIMITATION OF LIABILITY** .................................. 25

SECTION 16.1. INDEMNIFICATION BY OWNER .................................................................... 25
SECTION 16.2. INDEMNIFICATION BY MANAGER ............................................................... 25
SECTION 16.3. NO SUCCESSOR LIABILITY ......................................................................... 26

**ARTICLE XVII MISCELLANEOUS** ............................................................................... 26

SECTION 17.1. SEVERABILITY ........................................................................................... 26
SECTION 17.2. NO WAIVER ............................................................................................... 26
SECTION 17.3. AGENCY .................................................................................................... 26
SECTION 17.4. CONSENTS ................................................................................................. 26
SECTION 17.5. MEDIATION ............................................................................................... 26
SECTION 17.6. ATTORNEY'S FEES ..................................................................................... 27
SECTION 17.7. SUCCESSORS BOUND .................................................................................. 27
SECTION 17.8. NOTICES ................................................................................................... 27
SECTION 17.9. ENTIRE AGREEMENT ................................................................................. 27
SECTION 17.10. REFERENCES ........................................................................................... 27
SECTION 17.11. TIME ....................................................................................................... 27
SECTION 17.12. FINANCING OF HOTEL .............................................................................. 27
SECTION 17.13. TRADE NAMES ......................................................................................... 28
SECTION 17.14. THIRD PARTIES ........................................................................................ 28
SECTION 17.15. FURTHER INSTRUMENTS ........................................................................... 28
SECTION 17.16. ARBITRATION .......................................................................................... 28
SECTION 17.17. COUNTERPARTS ....................................................................................... 28
SECTION 17.18. ESTOPPEL CERTIFICATE ........................................................................... 28
SECTION 17.19. APPLICABLE LAW .................................................................................... 28

**SIGNATURE PAGE** .. ................................................................................................... 29

EXHIBIT A LEGAL DESCRIPTION OF REAL PROPERTY ...................................................... 30
EXHIBIT B INSURANCE COVERAGE .................................................................................. 31
EXHIBIT C OPERATING BUDGET REQUIREMENT ............................................................... 34
EXHIBIT D FORM OF UNIT RENTAL PROGRAM AGREEMENT .............................................. 35

-iii-

GHK050213

## MANAGEMENT AGREEMENT

This Management Agreement (this "**Agreement**"), dated as of May 1, 2013 (the "**Effective Date**") is by and between **Sanibel Sundial Partners, LLC** ("**Owner**") and **Mariner Management Services, LLC** ("**Manager**").

### RECITALS

A.      Owner is the is the owner of: (i) certain real property described on <u>Exhibit A</u> attached hereto and incorporated herein ("**Real Property**"); and (ii) is constructing/renovating certain improvements upon the Real Property ("**Improvements**") including, without limitation a 38,000 square foot Central Facilities Building to include guest reception, food and beverage facilities, meeting rooms, a spa facility, offices and storage areas; a main pool and pool bar facility, retail outlets; recreation amenities and facilities including 12 tennis courts; a real estate office; and parking and other common areas. In addition, Sanibel Sundial Partners, is the owner of a condominium Rental Program operated at the property for Participating Unit Owners ("**Rental Program**"). The Real Property and the Improvements are herein collectively called the "**Hotel.**"

B.      Manager is qualified to operate, direct, manage and supervise the Hotel and the Rental Program.

C.      Owner desires to engage Manager to: (i) to manage and operate the Hotel in accordance with the Annual Business Plan (as defined below); (ii) manage the Rental Program. Manager desires to accept such engagement as agent for Owner and for the account of Owner, all upon the terms and subject to the conditions set forth in this Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants contained herein, the sufficiency of which are hereby acknowledged by the parties hereto, Owner and Manager hereby agree as follows:

### ARTICLE I
### DEFINITIONS

As used in this Agreement, the following capitalized terms shall have the following meanings:

<u>Accounting Period</u> means each of twelve (12) accounting periods of one (1) calendar month occurring each Fiscal Year.

<u>Affiliate</u> means any person or entity that directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, Manager or Owner, as the case may be. For purposes of this definition, the term "control" means the power to direct or cause the direction of management and policies, through the ownership of voting rights, by contract or otherwise.

<u>Agency Account</u> shall have the meaning set forth in <u>Section 7.1</u>.

<u>Agreement</u> means this Management Agreement.

1

GHK050213

Annual Business Plan means the detailed annual business plan for the operation of the Hotel for each Fiscal Year prepared by Manager pursuant to Section 9.1.

Approval means the written approval of the Owner.

Asset Management Fee means the fee paid by Owner for asset management services.

Base Management Fee means the amount payable to Manager pursuant to Section 10.1(a).

Benefit Plans means all employee benefit plans of Manager, which may include, upon approval by Owner without limitation, a 401(k) plan, a bonus and incentive plan, and a health insurance plan.

Books and Records shall have the meaning set forth in Section 8.1.

Conditions Precedent shall have the meaning set forth in Section 4.7(a).

Consent means the written consent of the Owner.

Effective Date shall have the meaning set forth in the opening paragraph of this Agreement.

Employment Laws means federal, state, local and foreign statutes, laws, ordinances, regulations, rules, permits, judgments, orders and decrees affecting labor union activities, civil rights or employment in the United States, including, without limitation, the Civil Rights Act of 1870, 42 U.S.C. □ 1981, the Civil Rights Acts of 1871, 42 U.S.C. □ 1983 the Fair Labor Standards Act, 29 U.S.C. □ 201, et seq., the Civil Rights Act of 1964, 42 U.S.C. □ 2000e, et seq., as amended, the Age Discrimination in Employment Act of 1967, 29 U.S.C. □ 621, et seq., the Rehabilitation Act, 29 U.S.C. □ 701, et seq., the Americans With Disabilities Act of 1990, 29 U.S.C. □ 706, 42 U.S.C. □ 12101, et seq., the Employee Retirement Income Security Act of 1974, 29 U.S.C. □ 301, et seq., the Equal Pay Act, 29 U.S.C. □ 201, et seq., the National Labor Relations Act, 29 U.S.C. □ 151, et seq., and any regulations promulgated pursuant to such statutes, as amended from time to time, and together with any similar laws now or hereafter enacted.

Environmental Law shall mean: (i) the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. §§ 9601 et seq.), as amended; (ii) the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.), as amended; (iii) the Emergency Planning and Community Right to Know Act (42 U.S.C. §§ 11001 et seq.), as amended; (iv) the Clean Air Act (42 U.S.C. §§ 7401 et seq.), as amended; (v) the Clean Water Act (33 U.S.C. §§ 1251 et seq.), as amended; (vi) the Toxic Substances Control Act (15 U.S.C. §§ 2601 et seq.), as amended; (vii) the Hazardous Materials Transportation Act (49 U.S.C. §§ 1801 et seq.), as amended; (viii) the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. §§ 136 et seq.), as amended; (ix) the Safe Drinking Water Act (42 U.S.C. §§ 300f et seq.), as amended; (x) any state, county, municipal or local statutes, laws or ordinances similar or analogous to the federal statutes listed in parts (i) - (ix) of this definition; (xi) any rules, regulations, guidelines, directives, orders or the like adopted pursuant to or to implement the statutes, laws, ordinances and amendments listed in parts (i) - (x) of this definition; and (xii) any other law, statute, ordinance, amendment, rule, regulation, or order relating to environmental matters or Hazardous Materials.

FF&E means all furniture, furnishings, equipment, fixtures, apparatus and other personal property used in, or held in storage for use in, the operation of the Hotel (including Hotel FF&E) and excluding Operating Equipment, Operating Supplies and fixtures attached to and forming part of the Hotel.

Financial Statement shall have the meaning set forth in Section 8.2(a).

Fiscal Year means a calendar fiscal year starting on January 1 and ending on December 31, or portion thereof, depending upon the Effective Date and the Termination Date.

GAAP means those conventions, rules, procedures and practices (including the Uniform System of Accounts), consistently applied, that are generally accepted by independent accounting firms in the United States at the time in question. Any financial or accounting terms not otherwise defined in this Agreement are construed and applied according to GAAP and the Uniform System of Accounts.

Gross Revenues shall mean all revenues and receipts of every kind derived from the operation of the Hotel and all departments and parts thereof in accordance with GAAP and the Uniform System, including, without limitation, income (from both cash and credit transactions after reasonable deductions for bad debts and discounts for prompt or cash payments and refunds) from the rental of guest rooms, telephone charges, stores, offices, exhibit and sales space of every kind; license, lease and concession fees and rentals (but excluding gross receipts of licensees, lessees and concessionaires or of the rental of Hotel Units by Unit Owners not participating in the Rental Program); income from vending machines; net income from parking; club membership fees; food and beverage sales; wholesale and retail sales of merchandise; service charges (to the extent not distributed to employees as gratuities), and proceeds, if any, from business interruption or other loss of income insurance. Expressly excluded from the definition of Gross Revenues are the following: gratuities to employees of the Hotel; federal, state, and local excise, sales or use taxes or any other taxes collected directly from patrons or guests or included as part of the sales price of any goods or services; proceeds from the sale of FF&E; insurance proceeds (other than proceeds from business interruption or other loss of income insurance); condemnation proceeds (other than for a temporary taking); revenue from rental of any radio or transmitter antennae or tower; any proceeds from any sale of the Hotel or from the refinancing of any debt encumbering the Hotel; contributions by Owner; proceeds of property tax abatements or refunds; Refurbishment Reserves; Replacement Fund; interest or earnings on any reserves; and income or receipts related to damage awards received from third parties.

Group Services means group benefits, services, and facilities generally made available by Manager at other properties owned or managed by Manager or its Affiliates, including, where applicable, convention, business and sales-promotion services; advertising and public relation services; centralized reservation services; computerized management information services; educational and training programs and facilities; central purchasing and procurement services; employee benefits administration; payroll administration; and risk management services. Group Services does not include Manager's central office overhead and general office and administrative expenses (as opposed to that of the Hotel).

Hazardous Material shall mean any chemical, substance, waste, material, equipment or fixture defined as or deemed hazardous, toxic, a pollutant, a containment, or otherwise regulated under any Environmental Law, including, but not limited to, petroleum and petroleum products, waste oil, halogenated and non-halogenated solvents, PCBs, and asbestos and asbestos containing materials.

Hotel means: (i) the Real Property and the Improvements as such may exist at any time during the Term; (ii) the Hotel FF&E; (iii) the Participating Hotel Units (including the Unit Rental Management Agreements related thereto); and (iv) all other items of real and personal property at any time used in connection with the operation of the foregoing, collectively.

Hotel FF&E means the FF&E located on the Real Property and not within the Participating Hotel Units.

House Profit means the excess, during each Fiscal Year (and proportionately for any period less than a Fiscal Year), of Gross Revenues over Operating Expenses incurred in the operation of the Hotel by Manager in fulfilling its duties hereunder during such Fiscal Year, determined in accordance with the accounting system established by the Uniform System (except as modified by this Agreement). In arriving at House Profit, all

expenses shall be proper deductions from Gross Revenues insofar as they relate to the operation of the Hotel excluding the: Incentive Fee; Asset Management Fee, sales, use, occupancy, or other excise taxes, duties, fees or impositions, and interest, depreciation, and amortization.

Improvements shall have the meaning set forth in Recital A.

Incentive Fee means the amount payable to Manager pursuant to Section 10.1(b).

Laws means any and all laws, rules, regulations, requirements, orders, notices, determinations and ordinances of any federal, state, municipal or other authority having jurisdiction over the Hotel and the Condominium, now or hereafter in force, including, without limitation, Environmental Law, Employment Law, any alcoholic beverage control board, health inspectors, the Board of Fire Underwriters and any insurance companies covering any of the risks against which Owner or Manager are insured under this Agreement.

Management Fee means the aggregate of the Base Management Fee and the Incentive Fee.

Manager means Mariner Management Services, LLC, a Florida limited liability company and its successors or assigns.

Manager Indemnitees shall have the meaning set forth in Section 16.1.

Manager Requested Advance shall have the meaning set forth in Section 7.4(b).

Mortgage means any mortgage, deed of trust, or other security instrument entered into by Owner secured by the Hotel and loan documents related thereto.

Operating Budget means the operating budget prepared by Manager for the Hotel for each Fiscal Year for which an Annual Business Plan is prepared, setting forth an itemized statement of any and all anticipated costs and expenses to be incurred in connection with the operation, direction, management and supervision of the Hotel for such Fiscal Year. The Operating Budget shall include the information detailed in Exhibit C.

Operating Equipment means all equipment, except for FF&E and Operating Supplies, used, or held in storage for future use, in connection with the operation of the Hotel including, without limitation, all dishes, platters, serving trays, china, glassware, linens, silverware, uniforms and all kitchen, restaurant and bar equipment.

Operating Expenses shall mean expenses and deductions incurred in the operation of the Hotel by Manager in fulfilling its duties hereunder during each Fiscal Year, determined in accordance with the accounting system established by the Uniform System (except as modified by this Agreement). Operating Expenses shall not include the Asset Management Fee, Incentive Fee, sales, use, occupancy or other excise taxes, duties, fees, or impositions. Operating Expenses shall not include amortization and depreciation, the making of the repayment of any loans or any interest thereon, the cost of any alterations, additions or improvements which for federal income tax purposes must be capitalized and amortized over the life of such alteration, addition or improvement, payments into or out of any Rental Management Agreement Refurbishment Reserve, or any expense that is the direct obligation of a Participating Unit Owner pursuant to a Unit Rental Management Agreement.

Operating Funds shall have the meaning set forth in Section 7.2.

Operating Supplies means all supplies, except for FF&E and Operating Equipment used, or held in storage for future use, in connection with the operation of the Hotel including, without limitation, all engineering, maintenance and housekeeping supplies and all food and beverages of all kinds.

-4-

Original Term shall have the meaning set forth in Section 2.1.

Owner means Sanibel Sundial Partners, LLC, a Pennsylvania limited liability company, and its successors and assigns.

Owner Indemnitees shall have the meaning set forth in Section 16.2.

Participating Hotel Units means all Hotel Units owned by Unit Owners who have entered into Unit Rental Management Agreements with Owner as to such Hotel Units.

Participating Unit Owner(s) means the record title holder of a Hotel Unit(s) who has entered into a Unit Rental Management Agreement with respect to such Hotel Unit(s)

Refurbishment Reserves means the reserve account established pursuant to the Unit Rental Management Agreements (if applicable) for the periodic repair, replacement, and refurbishment of the Participating Hotel Units and its contents.

Real Property shall have the meaning set forth in Recital A.

Renewal Term shall have the meaning set forth in Section 2.2.

Rental Manager means Owner that will be offering the Rental Program to Unit Owners pursuant to the Unit Rental Management Agreement.

Rental Program means the voluntary, non-pooled rental management program offered by Owner to purchasers of Hotel Units, established for the transient rental of Hotel Units in accordance with the terms and conditions of the Unit Rental Management Agreements.

Required Minimum Amount means the amount of working capital necessary for Manager to ensure that the Hotel and the Rental Program has sufficient cash to pay its bills in a timely manner, which amount shall initially be set at fifty-thousand dollars ($50,000) subject to change upon mutual agreement between Owner and Manager.

Sale Termination Notice shall have the meaning set forth in Section 14.3.

Taxes means any and all real estate taxes, personal property taxes, assessments, ad valorem taxes and similar charges on or relating to the Hotel or any of its component parts.

Termination Date shall have the meaning set forth in Section 2.1.

Term shall have the meaning set forth in Section 2.2.

Termination Procedure shall have the meaning set forth in Section 12.2.

Uniform System means the Uniform System of Accounts for Hotels, "Ninth Revised Edition," 1996, as revised and adopted by the Hotel Association of New York City, Inc., in effect from time to time and as modified by applicable provisions of this Agreement.

Unit FF&E mean the FF&E located in Participating Hotel Units and owned by Participating Unit Owners.

Unit Rental Management Agreement(s) mean the agreement(s) governing a Unit Owner's voluntary

participation in the Rental Program offered by Owner.

Unit Owners shall mean the owners of the Participating Hotel Units.

## ARTICLE II
## TERM

Section 2.1.    Term.  The term of this Agreement shall commence on the Effective Date and shall continue until the fifth (5th) anniversary after the Effective Date ("**Original Term**") unless sooner terminated by Manager or Owner pursuant to the provisions of this Agreement.  The date this Agreement actually terminates shall hereinafter be called the "**Termination Date.**"

Section 2.2.    Renewal Terms.  This Agreement shall be automatically renewed for one (1) successive five (5) year term ("**Renewal Term**") unless Owner or Manager provides written notice to the other party on or before one hundred eighty (180) days prior to the expiration of the then current Original Term, that it elects not to renew this Agreement. The Original Term and the Renewal Term shall be sometimes referred to as the "**Term.**"

## ARTICLE III
## ENGAGEMENT OF MANAGER

Section 3.1.    Engagement of Manager to Manage Hotel.  Owner hereby grants to Manager the sole and exclusive right, and hereby appoints Manager as Owner's sole and exclusive agent, subject to the terms of this Agreement and the Unit Rental Management Agreements, to operate, direct, manage and supervise the Hotel in accordance with the Annual Business Plan, without interference from Owner, and Manager hereby undertakes and agrees to perform, as the agent of and for the account of Owner, all of the services required hereunder and to comply with all of the provisions of this Agreement.  On behalf of Owner, Manager shall operate and administer Owner's rights, remedies and obligations under the Unit Rental Management Agreements and the Rental Program pursuant to the terms thereof and otherwise as provided in this Agreement and the Unit Rental Management Agreements as part of the Hotel operation. The performance of all activities by Manager hereunder shall be as Owner's independent contractor, provided that Owner shall bear no responsibility for activities of Manager beyond the scope of Manager's authority under this Agreement.  All debts and liabilities to third persons expressly permitted to be incurred by Manager under this Agreement in the course of its operation and management of the Hotel shall be the debts and liabilities of Owner only.  Manager shall not be liable for any such obligations by reason of its management, supervision, direction and operation of the Hotel for Owner and Unit Owners, and Manager shall have no liability to Owner and Unit Owners for any loss suffered or the Unit Rental Management Agreements, so long as Manager performs in good faith in accordance with the duties and authority of Manager set forth in this Agreement the Unit Rental Management Agreements, in compliance with all legal requirements, and in the absence of fraud, negligence, willful or intentional misconduct.

Section 3.2.    Manager as Agent.  Manager, and all employees of Manager working at the Hotel, shall act solely on behalf of and as agent for Owner and not on its own behalf.  All employees working at the Hotel shall be employees of Manager and Manager shall have no authority to hire employees for Owner. Nothing contained in this Agreement shall be construed as creating, between the parties hereto or with any third party, a partnership, joint venture or any relationship other than agency.  Any and all debts, obligations and other liabilities incurred by Manager in connection with the Hotel in accordance with the Annual Business Plan (and in connection with the Rental Program in accordance with the Unit Rental Management Agreements), shall be incurred on behalf of Owner, and Manager shall not be liable for payment therefor; provided, Manager and its employees and agents shall not incur debts or other liabilities on behalf of Owner unless the same are: (i) reasonable; (ii) necessary or reasonably prudent for operation of the Hotel; (iii) within

the approved Operating Budget; or (iv) otherwise specifically approved by Owner. Owner and Manager stipulate and agree that the agency created by this Agreement shall be deemed to be "an agency coupled with an interest" and therefore not terminable by Owner except in strict accordance with the terms of this Agreement.

## ARTICLE IV
## OPERATION OF THE HOTEL

Section 4.1.    Duties of Manager.  Manager shall use commercially reasonable and prudent efforts to: (i) direct, supervise, manage and operate the Hotel in accordance with the Annual Business Plan and in all aspects in an efficient and economical manner consistent with hotels of a comparable size, class, age and construction and level of service having similar facilities; and (ii) determine and administer the programs and policies to be followed in connection therewith, all in accordance with the provisions of this Agreement, on the condition that Manager shall not be obligated to advance any of its own funds in connection with such duties. Without limiting the generality of the foregoing, Manager shall perform each of the following functions:

(a)    Recruit, employ, relocate, pay, supervise and discharge all employees and personnel necessary for the operation of the Hotel (included in the foregoing shall be the determination of all personnel policies).

(b)    Establish all prices, rates and charges for guest rooms, meeting rooms, commercial space (including all stores, office space and lobby space), food, beverage, and other salable or rentable items comprising the Hotel and its business.

(c)    To the extent within the control of Manager, obtain and keep in full force and effect, either in its own name on behalf of Owner or in Owner's name, as may be required by applicable Laws, any and all new, renewal and additional licenses and permits necessary to enable Manager to operate the Hotel in accordance with applicable Laws including, without limitation, those licenses and permits necessary for the sale of alcoholic beverages to be consumed on premises or sold in unopened containers at: (i) the Hotel; (ii) any restaurant and lounge located within the Hotel; and (iii) any other usual and customary locations where alcoholic beverages are sold within the Hotel.

(d)    Accord rooms to persons to whom such privileges are customarily accorded in the industry, including, without limitation: (i) employees of Manager's parent company, pursuant to its personnel policies, at Manager's then-standard employee rates, and subject to space availability; and (ii) such employees of Owner as Owner may from time to time designate.

(e)    Establish and revise, as necessary, administrative policies and procedures including, without limitation, policies and procedures for the control of revenue and expenditures, for the purchase of Operating Equipment, Operating Supplies and services, for the control of credit, and for the scheduling of maintenance.

(f)    Procure, or arrange for the procurement of, as agent for Owner, all replacement Operating Equipment and Operating Supplies necessary to maintain and operate the Hotel properly in the ordinary course of business.

(g)    Procure, or arrange for the procurement or replacement of, as agent for Owner, Unit FF&E in accordance with the requirements of the Unit Rental Management Agreements.

(h)    Implement preventative maintenance programs.

(i)    Arrange and contract for all advertising and promotion of the Hotel which Manager in its reasonable discretion deems necessary or appropriate for the operation of the Hotel.

(j)    Establish entertainment and amusement policies (including pricing).

(k)    Promote the name and reputation of the Hotel, including for transient occupancy purposes.

(l)    Open and maintain the Agency Account as required by this Agreement.

(m)    Prepare and deliver to Owner the Annual Business Plans and Financial Statements, and such other information as required by this Agreement.

(n)    Plan, execute and supervise repairs and maintenance at the Hotel, subject to the restraints of Section 11.

(o)    Provide the Group Services.

(p)    Procure and maintain insurance in accordance with Article XII.

(q)    Keep Owner advised as to all major policy matters affecting the Hotel.

(r)    Manager shall be liable for any failure of the Hotel to comply with all Employment Laws.

(s)    Conduct such other operations from time to time as may be required under this Agreement.

Section 4.2.    Authority of Manager.  Except as otherwise specifically set forth in this Agreement: (i) the management and operation of the Hotel shall be under the exclusive supervision and control of Manager; and (ii) Manager shall have reasonable discretion and control, free from unreasonable interference, interruption or disturbance, in all matters relating to management and operation of the Hotel.  To the extent Manager can deliver any of its functions more efficiently by outsourcing such functions to a third party, Manager shall have the option, at its sole discretion, to outsource such functions; provided, however, such decisions shall be in accordance with the Annual Business Plan.

Section 4.3.    Limitations on Authority.

(a)    Notwithstanding Sections 4.1, 4.2 and 5.1 of this Agreement, Manager shall not permit or undertake, without the express written consent of Owner (which consent shall not be unreasonably withheld, delayed or conditioned) any of the following actions:

(1)    entry into any restricted contract;

(2)    entry into any contract or arrangement which at the time it is made, will, together with all contracts or arrangements previously made, require expenditure in respect of FF&E which would cause it to exceed the Operating Budget;

(3)    making of, or entry into any arrangement to make any unbudgeted structural alterations or additions to the Hotel except in circumstances expressly permitted this Agreement;

- 8 -

(4)      the institution or defense of legal proceedings (including the selection of legal counsel and advisors) arising out of any claims pertaining to or involving the use, ownership, management or operation of the Hotel or the Hotel in general or which involve any of the duties or responsibilities of Manager under this Agreement; which Claim involves an amount in controversy in excess of twenty-five thousand dollars ($25,000.00), which is not covered by insurance or as to which the insurance company denies coverage or "reserves rights" as to coverage;

(5)      Negotiate and enter into, on behalf of Owner, concession agreements, leases, licenses and similar contracts for use by concessionaires, tenants, licensees and other intended users of the facilities at the Hotel; provided, however, Manager may enter into any agreement, lease, license or contract contemplated by this subsection that is cancelable by Owner on a maximum of ninety (90) days prior notice without penalty or without the prior written consent of Owner, which consent shall not be unreasonably withheld.

(6)      Negotiate and enter into, on behalf of Owner, service contracts required in the ordinary course of business in operating the Hotel including, without limitation, contracts for electricity, gas, telephone, cable and satellite television, cleaning, vermin extermination, elevator and boiler maintenance, and other services which Manager deems advisable; provided, however, Manager may enter into any service contract contemplated by this subsection that would not bind Owner for a period greater than one (1) year or that would obligate Owner for an amount in excess of ten thousand dollars ($10,000.00) per year and such contract is cancelable by Owner on a maximum of ninety (90) days prior notice without penalty or without the prior written consent of Owner, which consent shall not be unreasonably withheld;

(7)      the borrowing of any money or execution of any credit obligation in the name and on behalf of Owner, except in connection with trade payables for goods and services incurred in the ordinary course of business in the operation and management of the Hotel in accordance with the terms of this Agreement and as set forth in an approved Operating Budget;

(8)      the grant of a security interest, pledge or mortgage on all or any part of the Hotel or the FF&E, other than purchase money financing for equipment where the amount of the indebtedness is not greater than fifty-thousand ($50,000);

(9)      the incurrence of any liability or obligation on behalf of Owner to third parties which is unrelated to the operation, maintenance or security of the Hotel or to the performance of Manager's responsibilities under this Agreement;

(10)      the employment of any professional firm (other than legal counsel and accountants, which must be by Owner in every instance) for more than ten thousand dollars ($10,000.00) in aggregate annual billings, except as set forth in the Operating Budget, or the entry into of arrangements for engagement of any attorney or accountant;

(11)      the prosecution or settlement of any tax claims or appeals;

(12)      consent to any condemnation or participate in any condemnation proceeding relating to the Hotel other than with respect to Manager's own independent claim;

(13)      the sale, transfer or other disposal of all or any portion of the Hotel except for dispositions of FF&E to the extent expressly permitted herein or provided for in the Operating Budget;

(14)      the performance of any alterations to the Hotel or any portion thereof (including alterations to any of the Hotel's building systems or structural elements) except to the extent

Manager's performance of such alteration shall be expressly provided for in this Agreement or in an approved Operating Budget or capital budget;

(15)    Manager shall collect, maintain and utilize the Refurbishment Reserves provided under the Unit Rental Management Agreements (if applicable) solely for purposes of repairing and replacing Participating Hotel Unit FF&E in the Participating Hotel Unit to which the particular funds relate and performing certain other repairs and maintenance matters in the Units, strictly in accordance with the Unit Rental Management Agreements.

(16)    the entry into any union or other collective bargaining agreements or pension plan applicable to the Hotel which binds Owner or its successors;

(17)    pledge, guaranty or otherwise subject the Hotel to any charges, liens or encumbrances (financial or otherwise) except as expressly permitted herein;

(18)    any transfer of budgetary amounts between the line items of expenses in an approved Operating Budget or transfer of surplus from one line item to another line item;

(19)    the making of any capital expenditures (other than in the case of emergencies) except in accordance with an approved capital budget; or

(20)    discrimination against the Hotel and in favor of other hotels owned or managed by Manager or its Affiliates. Any goods or services provided to Manager by, or obtained by Manager from, an Affiliate of Manager, or any entity in which Manager or its Affiliates has any management or control, and any agreements, understandings or arrangements with respect thereto, shall be provided or made in a manner such that the Hotel is treated on a fair and equitable basis relative to such other properties;

Section 4.4.    Employees.    Except as otherwise set forth in this Agreement, Manager shall have absolute discretion and control over all personnel matters and personnel employed at the Hotel (the employees being employees of Manager) including, without limitation, decisions regarding hiring, promoting, transferring, compensating, supervising, terminating, directing and training all employees at the Hotel, and, generally, establishing and maintaining all policies, including, without limitation, compensation and benefits, relating to employment. All such personnel matters shall be handled in a manner consistent with the Annual Business Plan and approved Operating Budget. Owner shall not directly exercise any authority over or interfere with any personnel employed at the Hotel except that the Owner shall have the right to interview and approve the hiring of the hotel general manager and any and all department heads if owner chooses, such approval not to be unreasonably withheld, conditioned or delayed.

(b)    Owner shall reimburse Manager for the monthly salary, payroll taxes and fringe benefits under the Manager's Benefit Plans of all personnel employed by Manager and located at the Hotel. Owner acknowledges that it has reviewed and approved Manager's Benefit Plans. Owner shall also reimburse Manager for all reasonable out-of-pocket costs and expenses incurred when the general manager and/or department heads of the Hotel attend meetings, functions, training sessions or conventions deemed advisable by Manager including, without limitation, travel, program and materials costs approved in advance by owner or having been budgeted in the Annual Business Plan.

(c)    Since the general manager of the Hotel may need to reside at the Hotel and be available full-time to perform properly the duties of his employment, he may receive at Manager's discretion, and in accordance with Manager's personnel policies, free of charge and in addition to his salary, free room and board and reimbursement for any reasonable expenses which he may reasonably incur in the performance of his duties.

(d)     Owner agrees that it shall not directly or indirectly hire, employ, retain, contract or in any manner become associated with the Manager's corporate level employees at any time for a period of one (1) year following termination of this Agreement.

(e)     Litigation.  Manager shall not initiate, settle or otherwise dispose of litigation relating to the Hotel that the claim asserted exceeds five-thousand dollars ($5,000), without Owner's prior written consent.  Notwithstanding the foregoing, nothing shall limit Manager's ability to defend, settle or otherwise dispose of litigation against Manager in its individual capacity and not as an agent of Owner.

Section 4.5.     <u>Owner's Right of Inspection and Review</u>.  Manager shall permit Owner and its duly authorized agents and representatives, upon reasonable notice, the right to enter upon any part of the Hotel at all reasonable times for the purpose of examining or inspecting the Hotel, its records, or operation or any other purpose which Owner, in its reasonable discretion, shall deem advisable.

Section 4.6.     <u>Standards</u>.  Manager shall operate the Hotel and all its facilities and activities in the same manner as is customary and usual in the operation of similar hotels in the area of the Hotel and for properties of similar age and construction, all to the extent consistent with the Annual Business Plan, Operating Budget and the Hotel's facilities.  Manager will be available to consult with and advise Owner, at Owner's reasonable request, concerning all policies and procedures affecting all phases of the conduct of business at the Hotel.  Manager shall be available on not less than a monthly basis to discuss the operating results of the Hotel.

Section 4.7.     <u>Rental Program</u>.

(a)     Subject to the satisfaction of the conditions set forth in subparagraphs (1) through (3) below (**"Conditions Precedent"**), (the timely satisfaction of which shall be the responsibility and obligation of Owner under this Agreement), Manager shall (as part of its Hotel management services under this Agreement and on Owner's behalf) provide the services described in the Unit Rental Management Agreements to be performed by Owner, as a subcontractor or delegatee of Owner, all subject to, limited by and in accordance with, this Agreement, it being understood that in the event of any conflict between the scope of Manager's duties, liabilities, undertakings and services as set forth in this Agreement and those set forth in the Unit Rental Management Agreements the terms of this Agreement shall govern and control.  The Conditions Precedent include the following:

(1)     Owner's compliance with and satisfaction of its obligations, covenants, warranties and representations in this Agreement;

(2)     execution of the Unit Rental Management Agreements between Owner and each of those Unit Owners desiring to submit their Unit for transient rental as part of the Hotel, and delivery of originals or copies thereof to Manager; and

(3)     the Participating Hotel Units being and remaining constructed, furnished, equipped and maintained in accordance with the first class standard for the Hotel.

Owner hereby agrees to timely satisfy all Conditions Precedent set forth in this <u>Section 4.7(a)</u>.

(b)     Owner hereby delegates to Manager all rights, obligations and remedies of Owner under the applicable Unit Rental Management Agreements, for so long as Manager shall be providing the services described therein, which rights and remedies shall be exercised by Manager in accordance with the terms of this Agreement.  Manager accepts such rights, agrees to perform the obligations of Owner thereunder and otherwise diligently comply with the terms thereof from and after the satisfaction of the conditions set forth in the Unit Rental Management Agreements.

(c)     Owner agrees that Owner (or any of its Affiliates, representatives or designees) shall not, without the prior consultation and notice to Manager amend, modify or terminate Unit Rental Management Agreements.

(d)     Notwithstanding any other provision of this Agreement to the contrary, Manager's obligations, liabilities, duties and expectations with respect to any Unit Rental Management Agreement, shall be subject to true and complete copies thereof shall have been delivered to Manager within a reasonable time to allow Manager to evaluate the scope of its obligations related thereto and put itself in a position to perform the obligations to be performed by Manager on behalf of Owner thereunder. Owner acknowledges and agrees, without limiting the foregoing, that any failure of Manager to comply with the provisions of any Unit Rental Management Agreement that Owner is bound to comply with pursuant thereto, shall not be an event of default under this Agreement unless such failure is also a breach or violation of a specific obligation, covenant, duty or agreement of Manager as provided in this Agreement. Manager shall use good faith and reasonably diligent efforts to perform its obligations in all material respects under the Unit Rental Management Agreements.

### ARTICLE V
### OPERATING EXPENSES PAID BY OWNER

Section 5.1.     Expenses Incurred by Manager on Behalf of Owner. Subject to the other provisions of this Agreement, all actions of Manager and its Affiliates in the performance of their obligations and all expenses incurred under this Agreement and consistent with the Annual Business Plan and the Operating Budget, including, without limitation, all payroll, Benefit Plans and payroll related expenses of the Hotel's employees shall be for and on behalf of Owner and for its account. All debts and liabilities arising in the course of business of the Hotel shall be the obligation of Owner, and Manager or its Affiliates shall not be liable for any of such expenses, debts, liabilities and obligations by reason of its performance under the direction, management, supervision and operation of the Hotel on behalf of Owner. Neither Manager nor any of its Affiliates shall be obligated to advance any of its own funds to or for the account of Owner or the Hotel, or to incur any liability on behalf of Owner or the Hotel unless Owner shall have furnished Manager with funds necessary for the discharge thereof prior to incurring such liability. Owner shall indemnify, defend and hold Manager and its Affiliates harmless from and against all loss, costs, liability, and damage (including, without limitation, attorneys' fees and expenses) arising from Owner's failure to pay such debts and liabilities; and the provisions of this Section 5.1 shall survive any termination of this Agreement.

Section 5.2.     Professional Services. Manager may hire independent contractors to provide such legal, accounting and other professional services as Manager deems necessary or appropriate in the ordinary course of business provided written approval is given by Owner prior to the execution of any contract and such contract is cancelable by Owner on a maximum of sixty (60) day prior notice without penalty.

Section 5.3.     Contracts with Affiliates. Manager may, on behalf of Owner, contract with Affiliates of Manager for any services which are customarily provided to the Hotel or comparable properties by third party vendors, only on the condition that Owner has approved the contract or agreement: or (i) the fees charged or the terms of any such contract with Manager's Affiliate are no less favorable than the fees and terms which could be obtained from an unaffiliated third party; and (ii) such contract is cancelable by Owner on a maximum of sixty (60) days prior notice without penalty. All fees payable to Manager or its Affiliates pursuant to any such contract shall be in addition to the Management Fee; provided, however, if an Affiliate of Manager performs services Manager is required to provided under this Agreement, Manager shall be ultimately responsible to Owner for such Affiliate's performance and Owners shall not pay more for such Affiliate's services than Manager would have been entitled to receive under this Agreement had Manager performed the services.

Section 5.4.    <u>Reimbursable Expenses</u>.  Manager or any Affiliate may reimburse itself consistent with the terms of this Agreement for the payroll expense of any employee of Manager or an Affiliate of Manager who is performing a necessary job function including general manager, assistant manager, food and beverage manager, director of sales, sales manager and controller, on behalf of the Hotel or Owner.  Manager or any Affiliate may also reimburse itself for reasonable third party out of pocket costs and expenses incurred by Manager, Manager's Affiliates or personnel of Manager's Affiliates, as the case may be, in the course of fulfilling the duties described in this Agreement including, without limitation, charges for telephone, reproduction, postage and delivery, Group Services, attendance at training programs and reasonable travel expenses.

## ARTICLE VI
## COMPLIANCE WITH LAWS

Section 6.1.    <u>Compliance by Manager</u>.  Manager shall use its reasonable efforts to comply with and abide by all applicable Laws relating to the operation of the Hotel, including without limitation all Employment Laws, on the condition that Manager shall have the right, but not the obligation, in its reasonable discretion, to contest or oppose, by appropriate legal proceedings, the validity or applicability of any Laws.  Manager shall indemnify and hold harmless Owner from and against and loss, cost, damage expense and including without limitation, attorneys' fees as a result of such contest or non-compliance.

Section 6.2.    <u>Compliance by Owner</u>.  Owner shall comply with and abide by all applicable Laws relating to the ownership and operation of the Hotel, on the condition that Owner shall have the right to contest or oppose, by appropriate legal proceedings, the validity or applicability of any Laws and postpone compliance therewith pending the determination of such contest, if so permitted by Law and not detrimental to the operation of the Hotel.  If Owner contests or is in non-compliance with any Law, Owner shall indemnify and hold harmless Manager from and against any loss, cost, damage and expense (including without limitation, attorneys' fees), as a result of such contest or non-compliance.

## ARTICLE VII
## AGENCY ACCOUNT, OPERATING FUNDS
## AND REFURBISHMENT RESERVE FUND

Section 7.1.    <u>Agency Account</u>.  All monies received by Manager in the operation of the Hotel, including the Operating Funds furnished by Owner, shall be deposited in one or more accounts (collectively, the "**Agency Account**") in Manager's name, as agent of Owner, in the bank or similar institution recommended by Manager and approved by Owner.  Such monies shall not be commingled with any other funds of Manager.  Withdrawals from the Agency Account shall be made only by authorized representatives of Manager, on the condition that such representatives of Manager are bonded or otherwise insured.  All payments made by Manager under this Agreement shall be made from the Agency Account.  Owner shall be an authorized signatory on all Agency Accounts.

Section 7.2.    <u>Operating Funds</u>.  Owner shall maintain cash in the Agency Account in an amount not less than fifty-thousand dollars ($50,000), but, in all events, an amount reasonably estimated by Manager to be sufficient to operate the Hotel in a manner consistent with this Agreement.  Owner shall maintain cash in the Agency Account pursuant to each Annual Business Plan sufficient in amount to properly operate the Hotel ("**Operating Funds**").  If, at any time during the Term, the Operating Funds shall fall below the Required Minimum Amount, Owner shall deposit into the Agency Account, on or before three (3) business days after receipt of written notice from Manager of such shortfall, additional funds in an amount necessary to bring the Operating Funds up to the Required Minimum Amount.  Subject to the requirements of the Operating Budget for such Fiscal Year, any Operating Funds in the Agency Account in excess of the Required Minimum

- 13 -

Amount, shall be distributed to Owner on a monthly basis. Subject to the requirements of the Unit Rental Management Agreements, Manager shall pay on a monthly basis all amounts due to Participating Unit Owners.

Section 7.3.    Payment of Operating Expenses. Manager shall pay all ordinary operating expenses of the Hotel consistent with this Agreement, the Annual Business Plan, the Unit Rental Management Agreements, and the approved Operating Budget or approved by Owner out of Operating Funds including, without limitation: (i) any and all compensation and other benefits paid to employees of Manager at the Hotel, and (ii) any and all fees or compensation of any kind due Manager pursuant to this Agreement, all in accordance with the provisions of this Agreement. Manager shall not be required to make any advance or payment to or for the account of Owner except out of the Operating Funds, and Manager shall not be obligated to incur any liability or obligation on behalf of Owner.

Section 7.4.    Refurbishment Reserve Fund.

(a)    If applicable, Manager shall also maintain a separate account for the Refurbishment Reserve collected pursuant to the Unit Rental Management Agreements which shall be deposited, held and withdrawn strictly in accordance with the terms of the Unit Rental Management Agreements. Manager acknowledges that the Refurbishment Reserve funds collected from each Participating Unit Owner may only be used for repairs, replacements and refurbishments of such Participating Unit Owner's Hotel Unit.

(b)    With respect to funds for capital expenditure items required by the approved Operating Budget, or required by Law, if there are insufficient Operating Funds in the Agency Account to satisfy such requirements Owner agrees to advance the necessary funds to the Agency Account, which funds shall be treated as a "**Manager Requested Advance.**"

(c)    In the event a condition should exist in, on or about the Hotel of an emergency nature, including structural repairs, which requires that immediate repairs are necessary to preserve and protect the Hotel and assure its continued operation, and to protect the guests or employees, Manager, on behalf of and at the expense of Owner (or Participating Unit Owners, as applicable), is authorized to take all steps and to make all expenditures necessary to repair and correct any such condition, regardless of whether provisions have been made in the Operating Budget for any such emergency expenditures, and regardless of whether funds are then available, Manager may, at its option, advance such funds from its own accounts and demand immediate reimbursement from Owner. Manager shall use its best efforts to notify Owner of the nature of the emergency and seek Owner's advice prior to advancing funds hereunder.

## ARTICLE VIII
## BOOKS, RECORDS AND FINANCIAL STATEMENTS

Section 8.1.    Accounting System.

(a)    Manager shall keep full and adequate books of account and other records (collectively, the "**Books and Records**") as are necessary to reflect all the results of the operation of the Hotel on an accrual basis, all substantially in accordance with the Uniform System. In maintaining the Books and Records for the Hotel, Manager shall use the standard practices it follows with respect to similar facilities managed by Manager. Manager may perform accounting services at the Hotel, Manager's parent company corporate office, or such other location where Manager performs centralized accounting services. Manager reserves the right to enter into a contract with a qualified independent third party for payroll and other accounting services if Manager reasonably determines that it would be more efficient to do so and it is consistent with the approved Operating Budget; provided, however, Owner shall approve the engagement of any third party payroll and accounting professionals to provide services for the operation of the Hotel, such approval not to be unreasonably withheld and to be given in writing no later than five (5) business days

- 14 -

after written notice from Manager. Except for such Books and Records as Manager may elect to keep at its parent company corporate office or other suitable location, Manager shall keep the Books and Records at the Hotel and make them available to Owner and its representatives at all reasonable times for examination, audit, inspection and transcription.

(b)     Manager's obligation under this Article VIII is contingent upon Owner providing acceptable accounting hardware and software to Manager. Manager shall use its accounting software and the Owner shall provide its property based management systems, but these systems must be coordinated to function with the Owner's existing systems. If Manager reasonably determines that the current accounting equipment or property based management software at the Hotel is inadequate to perform the required accounting and management functions, Manager shall  so notify Owner and recommend such necessary hardware and software for purchase or lease by Owner. In making its determination of the adequacy of software and hardware Manager shall make reasonable efforts to use off the shelf software such as Excel and Word and existing hardware. Owner, or Manager on Owner's behalf, shall purchase or lease to the extent consistent with the approved Operating Budget such necessary hardware and software within thirty (30) days after Manager delivers such notice.

(c)     All Books and Records including, without limitation, books of accounts, guest records and front office records related to the Participating Hotel Units, but excluding personnel files and payroll records, shall at all times be the property of Owner. Upon termination of this Agreement, all Books and Records, shall be turned over to Owner to ensure the orderly continuation of the operation of the Hotel, on the condition that the Books and Records through termination shall be available to Manager and its representatives at all reasonable times by appointment for inspection, audit, examination and transcription.

(d)     Owner shall have the right to audit, by a third party auditor retained by Owner, all items of expenditure and revenue in connection with the Hotel. The costs of such audit shall constitute an Operating Expense in the Fiscal Year in which such audit is performed; provided, however, that if such audit discloses a discrepancy of two percent (2.0%) or more (but in no event less than one-hundred thousand dollars ($100,000)) between expenditure(s) or revenue(s) reported by Manager and those in the audit report prepared for Owner, Manager shall pay or reimburse Owner for the costs of such audit. Manager shall have the right to review the results of such audit. In the event of a discrepancy, Manager or Owner shall correct same by payment to the other party within ten (10) days following notice. If such audit discloses the need for changes in internal control systems pertaining to the safeguarding of Owner's assets, Manager will make all reasonably necessary changes. Any audit of expenses related to products or services provided by Manager or any of its Affiliates shall be conducted by Manager's independent certified accountants, unless such accountants cannot or do not certify that the matters which are the subject of any such audit are in all material respects as reported by Manager, in which event Owner's independent certified public accountants and representatives may then conduct any such audit. Nothing in this Section 8.1(d) shall limit Owner's rights and remedies with respect to a breach of this Agreement.

Section 8.2.     Financial Statements.

(a)     Manager shall deliver to Owner within twenty (20) days after the end of each Accounting Period, and within thirty (30) days after the end of each quarter, financial statements. Manager shall also deliver within thirty (30) days after the end of each Fiscal Year a preliminary financial statement followed by a final financial statement within sixty (60) days after the end of the Fiscal Year. All financial statements shall be in form and substance acceptable to Owner ("**Financial Statement**") and the Financial Statement shall include the following information:

(1)     Balance sheet as of the last day of the last month or as of the end of the Fiscal Year, as applicable, preceding the report;

      (2)     A consolidated income and expense statement for the preceding calendar month and Fiscal Year and comparing the current calendar month and Fiscal Year-to-date performance with the Operating Budget and previous year performance (if available);

      (3)     An income and expense statement by department showing results of Hotel's operation for the preceding calendar month and Fiscal Year and comparing the current calendar month and Fiscal Year-to-date performance with the Operating Budget and previous year performance (if available);

      (4)     Gross Revenues and/or distributions thereof;

      (5)     Calculations and payments of any Management Fee;

      (6)     Fixed asset additions; and

      (7)     Such other reports as Owner may reasonably request.

      (b)     Manager shall also prepare and deliver to each Participating Unit Owner a statement for each Participating Hotel Unit (no more frequently than monthly in accordance with Unit Rental Management Agreements) detailing the revenue, expenses, deductions and distributions attributable to each Participating Unit Owner's Participating Hotel Unit in accordance with the applicable Unit Rental Management Agreement.

      (c)     Manager shall also prepare and deliver to each Participating Unit Owner an annual statement for such year, detailing the revenue, expenses, deductions and distributions attributable to each Participating Unit Owner.

      (d)     The Financial Statements shall be determined from the Books and Records. Any disputes as to the contents of any Financial Statement or any accounting matter hereunder shall be determined by an independent certified public accountant to be agreed upon by both parties, whose decision shall be final and conclusive as to both Manager and Owner.

      Section 8.3.    Initial Accounting Records. Owner shall provide Manager with opening balance sheet entries for Manager's use within twenty (20) days after the Effective Date. Manager shall not be responsible for any reconstruction of accounting records prior to the Effective Date. Owner acknowledges that Manager has no knowledge of and cannot certify the accuracy of any historical financial information provided to Manager by Owner.

## ARTICLE IX
## ANNUAL BUSINESS PLAN

      Section 9.1.    Preparation of Annual Business Plan.

      (a)     Manager shall, at least sixty (60) days prior to the end of each Fiscal Year, submit to Owner for its approval, which approval shall not be unreasonably withheld, conditioned or delayed, an Annual Business Plan for the succeeding Fiscal Year.

      (b)     Each Annual Business Plan shall include without limitation the following, all in reasonable detail and, where appropriate, with the basis for all assumptions expressly set forth: (i) an Operating Budget; (ii) a marketing plan (including a rental marketing plan); (iii) a cash flow forecast; and (iv) a budget for capital improvements and fixed asset additions.

(c) Owner shall review the Annual Business Plan and either approve or notify Manager of any objections to the Annual Business Plan in writing on or before thirty (30) days after Owner's receipt thereof. If Owner fails to deliver written notice of disapproval of any proposed Annual Business Plan within such thirty (30) day period, Owner shall be deemed to have approved the Annual Business Plan as submitted by Manager.

Section 9.2.    Annual Business Plan Disputes. If Owner objects to all or any part of a proposed Annual Business Plan, Owner shall deliver written notice to Manager setting forth the specific objections of Owner to the Annual Business Plan, and Manager and Owner shall in good faith negotiate a mutually satisfactory Annual Business Plan. If Manager and Owner are unable to resolve disputes over an Annual Business Plan prior to commencement of the applicable Fiscal Year, then, until resolved, the amount of the disputed items shall be the actual amount expended for such items during the preceding Fiscal Year, adjusted for a full twelve months of operation and as such amount may be adjusted to reflect changes in the CPI. If such dispute relates to a net difference of less than One Hundred Thousand and No/100 Dollars ($100,000.00) for any applicable Fiscal Year, then the decision of the Owner shall control.

Section 9.3.    Deviations from Annual Business Plan.

(a) Upon approval by Owner of an Annual Business Plan, Manager shall use reasonable efforts to manage, operate and maintain the Hotel for the subsequent Fiscal Year in accordance with the Annual Business Plan.

(b) Manager shall be authorized to take appropriate remedial action without receiving Owner's prior consent: (i) in an emergency threatening the Hotel, its guests, invitees or employees, and will provide Owner with notice of same as soon as practical; (ii) if expenditures are immediately required and necessary to satisfy a legal requirement; or (iii) if the continuation of the given condition will subject Manager and/or Owner to civil or criminal liability, and Owner has either failed to remedy the situation or has failed to take appropriate legal action to stay the effectiveness of any Laws. In such an event, Manager shall cooperate with Owner in the pursuit of any such action and shall have the right to participate therein.

(c) Owner acknowledges that any approved Annual Business Plan is a reasonable estimate only and that any projections set forth in the Annual Business Plan are subject to and may be affected by changes in financial, economic and other conditions and circumstances beyond Manager's reasonable control and that such projections are not to be construed as a guaranty by Manager of the actual results of operations to be obtained.

(d) Owner acknowledges that the Hotel's compliance with the operating standards as set forth in Article IV, is essential in order to maintain the reputation for quality and guest service of the Hotel and to enhance public acceptance of, and demand for, the Hotel. Manager may vary from any Operating Budget to the extent Manager reasonably determines that such variance is required for compliance with the operating standards and Owner shall not unreasonably withhold its approval of variances from the Annual Business Plan to the extent such variances, in Manager's reasonable opinion, are necessary to keep the Hotel in a competitive, efficient and economical operating condition in accordance with the operating standards. Notwithstanding the foregoing, any such variances from any applicable Operating Budget by Manager shall be no more than ten percent (10%) for specific line items within the Operating Budget and no more than two and one half percent (2.5%) for the overall Operating Budget, without Owner's approval, which approval shall not be unreasonably withheld, conditioned or delayed. In addition and without prejudice to any other remedy available to it under this Agreement or under applicable Law, Manager is entitled to terminate this Agreement without penalty upon sixty (60) days prior written notice to Owner if Owner fails to approve any portion of an Annual Plan necessary to allow the Hotel to be operated in accordance with the operating standards that does not exceed the variance limits set forth in the

preceding sentence or if such approval is unreasonably withheld, conditioned or delayed with respect to any portions of an Annual Business Plan that does exceed such variance limits. Owner is entitled to terminate this Agreement without penalty upon sixty (60) days prior written notice to Manager if any portions of an Annual Business Plan exceed the variance limits set forth herein.

## ARTICLE X
## MANAGEMENT FEE AND EXPENSES

Section 10.1.    <u>Management Fee</u>.

(a)    In consideration of the services performed during the Term, Manager shall be paid, on the first day of each month after the Effective Date and thereafter until the end of the Term, a Base Management Fee equal to two and one-half percent (2.5 %) of the previous month's Gross Revenues.

(b)    In addition to the Base Management Fee and in consideration of the services to be performed during the term of this Agreement, Manager shall be paid by Owner for each Fiscal Year (or partial Fiscal Year), an Incentive Fee equal to twelve percent (12.0%) of the amount of House Profit for such Fiscal Year (or partial Fiscal Year).

Manager shall be authorized to withdraw any sums due Manager under this Agreement from the Operating Funds or any other funds available for such purpose. Nothing in this <u>Section 10.1</u> shall be construed to reduce or eliminate liability of the Owner for amounts due under this Agreement that are not available for reimbursement from available funds. Upon the Termination Date, any Management Fee due for a partial Fiscal Year shall be paid within thirty (30) days of the Termination Date.

Section 10.2.    <u>Extensive Remodeling</u>. Owner and Manager agree that any non-routine renovation or remodeling programs exceeding five-thousand dollars ($5,000) will be done by Owner, but if Owner requests that such programs be supervised by Manager those services are beyond the scope of this Agreement, and, if such services are requested by Owner, the additional fees for such services shall be negotiated in good faith between Owner and Manager (or Manager's applicable Affiliate). Manager will notify Owner and obtain Owner's approval of any expenses incurred pursuant to this <u>Section 10.3</u> in excess of one-thousand dollars ($1,000).

Section 10.3.    <u>Reimbursement of Expenses</u>. Owner shall be responsible for the payment of all costs and expenses incurred by the Hotel, Manager and/or its Affiliates through the actions of Manager and/or its Affiliates pursuant to this Agreement, the Annual Business Plan, the Operating Budget, and the Unit Rental Management Agreements. Owner shall reimburse Manager within thirty (30) days after Owner receives written notice from Manager for any debts and expenses relating to the Hotel that Manager and/or its Affiliates have paid. If Owner fails to reimburse Manager and/or its Affiliates for any such amount under this <u>Section 10.4</u> within such thirty (30) day period, such amount shall thereafter accrue interest at one percent (1.0%) per month from the end of such thirty (30) day period until paid. Nothing contained in this Agreement shall be deemed to require Manager to advance any funds on behalf of the Hotel or Owner.

## ARTICLE XI
## INSURANCE, DAMAGE AND CONDEMNATION

Section 11.1.    <u>Insurance</u>. Manager shall procure and maintain at Owner's cost and expense pursuant to <u>Section 5.1</u>, the insurance policies described in <u>Section 11.2</u> in amounts sufficient to reasonably and adequately protect Owner and Manager, against loss or damage arising in connection with the ownership, management and operation of the Hotel and to satisfy the requirements of the Mortgage (if applicable). Owner assumes all risks of, and Manager shall bear no responsibility for, coverage that is subsequently determined to be inadequate. All insurance policies: (i) shall be in the name of Manager (and any Affiliates of Manager as

Manager may specify) and endorsed by the issuing insurance company to reflect the Owner as an additional insured; (ii) shall contain riders and endorsements adequately protecting the interests of Owner, including, without limitation, provisions for at least thirty (30) days' notice to Owner prior to cancellation; (iii) shall be issued by financially sound and reputable insurers; (iv) shall provide that the insurer shall have no right of subrogation against Manager, Owner, Manager's Affiliates, or their agents or employees; and (v) shall be provided at Owner's expense. Any insurance required in Section 11.2 may be provided under the blanket insurance policy of Manager, which policy covers other hotel properties managed by Manager. All premiums, costs and expenses shall be allocated among the properties participating under such program in accordance with generally accepted underwriting standards. Any deductible applicable to any of the insurance required pursuant to Section 11.2 shall be paid by Owner. Owner assumes no responsibility for, or interest in, additional premiums or proceeds (other than standard audit adjustments) generated by the blanket insurance policy of Manager. Coverage extended to any additional insured or additional named insured under these policies will expire thirty (30) days after the Termination Date. Owner shall be provided certificates evidencing the insurance coverages required pursuant to this Article 11 on or before the Effective Date, and upon any and all subsequent renewals thereof. Owner shall have the right at any time for any reasonable period of time to place property and casualty insurance coverage, and with the consent of Manager (which shall not be unreasonably withheld or delayed) any other required coverage under this Article 11. If Owner notifies Manager that Owner shall place the insurance coverage, Manager shall cooperate with Owner and shall terminate, with advance notice to Owner, any overlapping insurance coverage.

Section 11.2.    Required Coverage. Manager shall procure and maintain, subject to Owner's prior right to place property and casualty insurance, and to the extent Owner, does not place or keep in force existing insurance coverages in amounts acceptable to Manager. Manager, at a minimum will procure and maintain the insurance policies with coverage limits and deductibles, all as provided in Exhibit B, to the extent applicable to the Hotel; provided, however, Manager shall solicit such insurance policies through a competitive bid process. Participating Unit Owners will be required to maintain contents insurance and liability insurance pursuant to the terms of the Unit Rental Management Agreements.

Section 11.3.    Other Insurance. Other insurance, such as flood and earthquake insurance, shall be maintained as required by Laws or if deemed advisable by Manager and approved by Owner to fully protect Owner, Manager and the holder of the first Mortgage on the Hotel (if applicable) against loss or damage arising in connection with the ownership, management and operation of the Hotel.

Section 11.4.    Owner Approval. All proposed insurance programs and associated policies and coverages shall be submitted to Owner for its review and express written approval.

Section 11.5.    Damage and Repair. If, during the Term of this Agreement, the Hotel is damaged or destroyed by fire, casualty or other cause and the estimated cost of repairs and related capital expenditures exceeds ten-thousand dollars ($10,000), Owner may, at its cost and expense and consistent with any loan documents secured by the Hotel with all reasonable diligence repair or replace the damaged or destroyed portion of the Hotel to at least the same condition as existed previously. Notwithstanding anything contained herein to the contrary, Owner shall have the exclusive right to determine whether to discontinue the operation of the Hotel. If Owner elects to discontinue operating the Hotel during any period of repair and rebuilding or if the Hotel is otherwise not fully operable and Manager continues operating the Hotel in a limited capacity, Owner shall pay Manager (from the proceeds of business interruption insurance or from Operating Funds; provided, however, such fee shall not be due and payable to Manager until such amounts have been paid to Owner by Owner's insurance carrier), each month until the Hotel is fully operational, an amount equal to one-twelfth (1/12) of the total Management Fee paid to Manager for the twelve (12) months immediately preceding the damage or destruction or, if Manager has managed the Hotel for less than twelve (12) months preceding the damage or destruction, an amount equal to the monthly average of the Management Fee projected to be paid to

Manager for the first Fiscal Year, as set forth in the initial Annual Business Plan. To the extent available proceeds from the insurance described in this Agreement shall be applied to such repairs or replacements.

If damage or destruction to the Hotel from any cause (excluding normal wear and tear) will, in Manager's reasonable opinion, materially and adversely affect the operation of the Hotel, and Owner fails to promptly commence and complete any required repairing, rebuilding or replacement of the same so that the Hotel shall be substantially the same as it was prior to such damage or destruction, Manager may, at its option, terminate this Agreement upon sixty (60) days prior written notice to Owner, and Owner shall have no further liability hereunder except for costs, expenses and fees that have accrued prior to the date of such termination.

Section 11.6.    Condemnation.

(a)    If all or substantially all of the Hotel shall be taken in any eminent domain, condemnation, compulsory acquisition, or similar proceeding by any competent authority for any public or quasi-public use or purpose, or if a portion of the Hotel shall be so taken so that it is unreasonable to continue to operate the Hotel in accordance with the standards required by this Agreement, this Agreement shall terminate, and Owner shall have no further liability hereunder except for costs, expenses and fees that have accrued prior to the date of such termination.

(b)    If all or substantially all of the Hotel shall be taken by the events described in Section 11.5, but the effect is of a temporary nature, then Owner shall pay Manager (from the proceeds of the award for such temporary taking or from Operating Funds; provided, however, such fee shall not be due and payable to Manager until such amounts have been paid to Owner by Owner's insurance carrier), each month until the Hotel is fully operational, an amount equal to one-twelfth (1/12) of the total Management Fee paid to Manager for the twelve (12) months immediately preceding the taking or, if Manager has managed the Hotel for less than twelve (12) months preceding the taking, an amount equal to the monthly average of the Management Fee projected to be paid to Manager for the first Fiscal Year, as set forth in the initial Annual Business Plan. To the extent available, any award for the taking or condemnation as shall be necessary to render the Hotel equivalent to its condition prior to such event may be used for such purposes.

(c)    If any partial or complete taking or condemnation will, in the Manager's reasonable opinion, materially and adversely affect the safe and orderly operation of the Hotel, Manager may, at its option, terminate this Agreement upon sixty (60) days prior written notice to Owner and neither Owner nor Manager shall have any further liability to the other and Owner shall have no further liability hereunder except for costs, expenses and fees that have accrued prior to the date of such termination.

(d)    Force Majeure. If act of God, acts of war, acts of terrorism, civil disturbance, labor strikes, governmental action, including, without limitation, the revocation or denial of any license or permit necessary for the operations contemplated in this Agreement where such revocation or denial is not due to Manager's fault, increases in minimum wage or benefit requirements, or any other causes beyond the control of Manager, will, in Manager's reasonable opinion, materially and adversely affect safe and orderly operation of the Hotel, then Manager may, at its option, terminate this Agreement upon sixty (60) days prior written notice to Owner and neither Owner nor Manager shall have any further liability to the other under this Agreement.

## ARTICLE XII
## TERMINATION

Section 12.1.    Right of Termination. This Agreement may be terminated at any time by either party hereto at its option for any or no reason. If either party exercises its right to terminate this Agreement prior to the Expiration Date of Original Term, the rights and obligations of the parties will cease except as to fees and reimbursements due the Manager or its Affiliates or the Owner pursuant to this Agreement.

Section 12.2.    Termination Procedure.

(a)    If a termination occurs pursuant to Section 12.1 hereof, the party electing to terminate shall give the other party written notice of such election. On the date which is sixty (60) days after the date of such notice ("**Termination Date**"), the Manager shall cease all activities at the Facility and shall have no further obligations under this Agreement except those obligations which specifically survive any termination hereof. Owner may terminate this Agreement immediately due to the gross negligence, willful misconduct or fraud by Manager. Owner and Manager agree that each shall remain obligated to perform their post-termination obligations in accordance with the terms of this agreement.

(b)    If the Facility (i) is sold, conveyed or otherwise transferred to another party, (ii) damaged or destroyed by casualty and the Owner has elected not to restore or (iii) taken in a condemnation proceeding, then this Agreement shall automatically terminate with respect to such Facility from the date of such sale, casualty or condemnation

(c)    Prior to the date the Manager ceases activities at the Facility, the Manager shall be paid any and all fees earned or expenses due it pursuant to this Agreement, and the Manager shall cooperate with the Owner in the orderly transfer of management to the Owner or the Owner's designated agent.

Section 12.3    Remedies. Upon the material breach of any term or condition of this Agreement by Manager the Owner shall be able to seek actual damages and/or equitable relief in the event that Manager commits a crime or intentional tort, as the case may be. Notwithstanding the foregoing, Owner and Manager each waive and agree that they shall have no right to seek or recover consequential or punitive damages upon any breach or default under this Agreement.

Section 12.4.    Payment of Outstanding Fees and Expenses. The termination of this Agreement for any reason shall not relieve any party of any accrued but unpaid payment obligations to the other party, and all accrued fees and expenses shall be paid in full on or before the Termination Date.

Section 12.5.    Rebates and Discounts. Because of its purchasing power derived through its operations of its own hotels, its management of the Hotel and its management or franchising of other hotels, Manager and/or its Affiliates may from time to time negotiate rebates and discounts from the vendors of certain products and services. Manager agrees that the portion of such rebates and discounts allocable to the Hotel will be promptly passed on to the Owner.

Section 12.6.    Remittance Upon Termination. Upon a termination of this Agreement, Manager shall, within sixty (60) days after termination of this Agreement, prepare and deliver to Owner a final unaudited accounting statement with respect to the Hotel (and separately with respect to each Participating Hotel Unit), along with a statement of any sums due from Owner (and any Participating Unit Owner) to Manager or from Manager to Owner (and any Participating Unit Owner) pursuant hereto, dated as of the date of said termination. Manager and Owner (for the remainder of this Section 12.6 and for Section 12.7, Owner and the Participating Unit Owners shall be collectively referred to as "Owner") acknowledge that there may be certain adjustments for which the necessary information will not be available at the time of such final unaudited accountings, and the parties agree to readjust such amounts and make the necessary cash adjustments when

- 21 -

such information becomes available and in any event at the time of delivery of the final audit, as provided below. Following receipt by Owner of such final unaudited accounting statements, the auditor for the Hotel shall prepare a final audit, including the auditor's opinion thereon along with confirmation of any sums due from Owner to Manager or from Manager to Owner dated as of the date of termination. Within fifteen (15) days following receipt by Owner of such final audit, the parties will make whatever cash adjustment may be necessary pursuant to such final statement. The cost of preparing such final audit and the fees and charges of the auditor in connection herewith shall be an Operating Expense, unless such termination occurs as a result of an uncured default by either party, in which case, the defaulting party shall pay all such costs and expenses. Unless there are ongoing disputes of which each party has received notice, all accounts shall be deemed final as of one (1) years after the date of Owner's receipt of the final audit. No later than the date of the final unaudited accounting referred to above, Manager shall release and transfer to Owner any funds which are held or controlled by Manager with respect to the Hotel. During the period between the Termination Date and the date of such final unaudited accounting, Manager shall pay (or reserve against) all Operating Expenses and other amounts which accrued (but were not paid) prior to the Termination Date, using for cash purposes any Gross Revenues which accrued prior to the Termination Date. Manager's final unaudited financial statement shall be accompanied by: (i) a statement showing all such post-termination disbursements by Manager of any such funds, plus; (ii) any undisbursed balance of such funds held by Manager (if it has not made such disbursements from the Agency Account). Upon completion of the final audit, any funds due to Manager will be delivered back to Manager by Owner for Manager's use in finalizing all outstanding payments incurred for the Hotel.

Section 12.7.    Additional Transition Obligations. Manager shall have the following additional obligations in connection with the aforementioned transition procedures:

(a)    render such assistance to Owner as Owner may reasonably request, to facilitate an orderly transition of the management of the Hotel, such assistance to be available to Owner for sixty (60) days subsequent to such termination or expiration;

(b)    turn over all original contracts, records, files and folios of every kind and description, whether relating to past, current or future bookings, tenants, customers, contracts, maintenance, repairs, assessments or otherwise and all other things, items or information reasonably necessary or appropriate to the continuing management, operation and maintenance of the Hotel, in the ordinary course of business, except any and all matters which are proprietary in nature;

(c)    turn over all keys, combinations to locks and other security devices at the Hotel;

(d)    turn over all supplies, inventory and other personal property of Owner in the possession of Manager;

(e)    turn over a complete inventory of all tangible personal property at the Hotel, together with an explanation, if reasonably feasible to do so, in reasonable detail, of any variances from such inventory as of such date as compared to most recent inventory; and

(f)    assign all existing contracts, except those with Manager and its Affiliates and those which are applicable to multiple hotels operated by Manager, relating to the operation, maintenance and marketing of the Hotel, to such party or parties as Owner directs in writing.

## ARTICLE XIII
## REPRESENTATIONS AND COVENANTS

Section 13.1.    Mutual Representations and Warranties. Owner and Manager each represent and warrant as to itself, as applicable, that: (i) all Recitals and representations in this Agreement are true and correct; (ii) each of Manager and Owner are duly formed or organized, validly existing and in good standing

- 22 -

under applicable Laws;  (iii) all requisite company, partnership or corporate action has been taken to permit each of Manager and Owner to enter into this Agreement and to carry out the terms hereof; (iv) the manager, officer or partner signing this Agreement is authorized to do so; and (v) neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will: (a) violate any Laws; (b) result in or constitute a breach or default under any indenture, contract or other commitment or restriction to which Manager or Owner is a party or by which either is bound; (c) require any consent, vote or approval which has not been obtained; or (d) result in the creation or imposition of any lien or encumbrance upon the Hotel or breach any instrument affecting the Hotel.

Section 13.2.    <u>Owner's Representations and Covenants</u>.  Owner represents, warrants and covenants to Manager as follows:

(a)        Owner has full power and authority to enter into this Agreement, and Owner's execution shall not breach any instrument affecting the Hotel.

(b)        The Hotel is zoned for use as a hotel and all necessary governmental and other permits and approvals for such use and for the food and beverage (including the sale and service of alcoholic beverages) operations of the Hotel have been obtained and are in full force and effect.

(c)        Owner has, and throughout the Term of this Agreement shall maintain, ownership of the Hotel (other than the Hotel Units), except as otherwise provided herein, and own or lease the FF&E and Operating Equipment, free and clear of all liens and encumbrances except those that do not materially affect the operation of the Hotel by Manager.

(d)        During the Term of this Agreement, Owner shall use its best efforts to pay, keep, observe and perform all payments, terms, covenants, conditions and obligations to be made, kept, observed or performed by Owner under any lease, license, franchise, concession, Mortgage or other agreement or security instrument with respect to the Hotel, and shall keep such agreements and instruments in full force and effect.

(e)        Manager, so long as it is not in default under this Agreement, shall have the right to peacefully and quietly possess, manage and operate the Hotel during the Term of this Agreement, but only in accordance with the terms of this Agreement, and Owner, shall, at its sole expense, undertake to assure such peaceful and quiet possession by Manager unless Owner is unable to do so because of the acts of Manager, its employee or agent.

(f)        Within ninety (90) days after the Effective Date, Owner shall provide Manager a full set of any available "as-built" drawings of the Hotel.

(g)        Owners of Hotel Units shall not be entitled to participate in the Rental Program until such time as Owner and each of the Unit Owners desiring to participate therein shall have entered into a Unit Rental Management Agreement.

(h)        With respect to any Hotel Units not in the Rental Program, Manager may provide ala carte food and beverage services, room service and limited housekeeping services, as mutually agreed upon by Owner and Manager in their reasonable discretion.  Manager shall not be obligated to provide such Hotel Units with ala carte maintenance or engineering type services.  In addition, if requested by Owner and agreed to by Manager, Manager shall provide other services for the benefit of any Hotel Units not in the Rental Program,  but in doing so, it shall be acting under and pursuant to the provisions of this Agreement, as agent for Owner, fulfilling duties and responsibilities of Owner as undertaken by Owner, and with no direct liability or obligation to such Unit Owners, all such services, and the terms and provisions pursuant to

which the same shall be provided by Manager, to be subject to the reasonable approval of Manager, which approval may be conditioned on such reasonable matters as Manager deems reasonably necessary.

Section 13.3.    <u>Manager's Representations and Covenants</u>.    Manager represents, warrants and covenants to Owner as follows:

(a)    Manager has full power and authority to enter into this Agreement.

## ARTICLE XIV
## ASSIGNMENT

Section 14.1.    <u>Assignment by Owner</u>.  Owner shall not assign or transfer or permit the assignment or transfer of this Agreement or any of Owner's rights and obligations hereunder without the prior written consent of Manager, such consent not to be unreasonably withheld, on the conditions that Owner may assign this Agreement without Manager's consent to any Affiliate of Owner or to any successor or assign that may result from the merger, consolidation or reorganization of Owner or its Affiliate provided that any such assignee shall assume and agree in writing to be bound by all of the terms and subject to all of the conditions set forth in this Agreement

Section 14.2.    <u>Assignment by Manager</u>.    Manager shall not assign or transfer or permit the assignment or transfer of this Agreement or any of Manager's rights and obligations hereunder without the prior written consent of Owner, however, Manager may assign this Agreement and/or any of Manager's rights and obligations hereunder without Owner's consent to any Affiliate of Manager or to an entity under the control of Manager or to any successor or assign that may result from the merger, consolidation or reorganization of Manager or its Affiliate, provided that any such assignee shall assume and agree in writing to be bound by all of the terms and subject to all of the conditions set forth in this Agreement.

## ARTICLE XV
## TAXES AND MORTGAGE

Section 15.1.    Taxes.  All Taxes accruing during the Term of this Agreement shall be paid by Owner or by Manager, upon Owner's request, from Operating Funds or funds provided by Owner before any fine, penalty or interest is added thereto or lien is placed upon the Hotel, unless payment thereof is, in good faith, being contested by Manager and/or Owner and enforcement thereof is stayed.  Owner may pay such Taxes in installments to the extent permitted by applicable Laws.  If payment is to be made by Manager, Owner shall promptly, after receipt, forward all notices of, and invoices for, the Taxes to Manager.  If payment is made by Owner, Owner shall deliver to Manager, prior to the respective due dates, proof of payment of the Taxes.  If Owner fails to timely pay any Taxes, Manager may, but is not obligated to, pay such Taxes on Owner's behalf from any available funds in the Agency Account, following which Owner shall immediately replenish the Agency Account in the amount of the Taxes paid by Manager.  Manager's responsibilities specifically exclude the preparation, filing or contesting of Taxes, unless requested by Owner in writing, on the condition that the cost of such preparation, filing or protest shall be paid by Owner.  Owner shall indemnify Manager from and against any costs, expenses, liabilities and claims relating to the payment or nonpayment of Taxes.

Section 15.2.    Mortgage.  If applicable, Owner or Manager at Owner's request shall make any and all mortgage payments for any Mortgage on the Hotel as and when they become due, and shall comply with and perform any and all covenants contained in such Mortgage, in each instance before any event of default (as defined in any such Mortgage) or other event occurs under any Mortgage, which would trigger mortgagee's right to institute foreclosure proceedings against the Hotel.

## ARTICLE XVI
## INDEMNIFICATION AND LIMITATION OF LIABILITY

Section 16.1.    Indemnification by Owner.  Except for liabilities incurred by Manager due to the negligence, willful misconduct or fraud of Manager, Owner hereby indemnifies, defends and holds harmless Manager and its Affiliates and each of their respective officers, directors, shareholders, employees, representatives and agents (collectively, the "**Manager Indemnitees**"), from and against any and all losses, costs, damages, liabilities, claims, demands, actions and causes of action and expenses whatsoever (including, without limitation, reasonable attorneys' fees and court expenses), incurred by the Manager Indemnitees arising out of, as a result of, or in connection with operation of the Hotel including, without limitation, (i) the performance by Manager or its Affiliates of its services hereunder, including, without limitation, any and all obligations incurred relating to any agreements with third parties entered into by Manager, its Affiliates or Owner in connection with the management or operation of the Hotel and in accordance with this Agreement; (ii) any act or omission (whether or not willful, tortious, or negligent) of Owner (including, without limitation, in connection with the offering of the Rental Program to Unit Owners) including without limitation, any duties of Owner under the Unit Rental Management Agreements that have been delegated or subcontracted to Manager hereunder, or any third party (except those for which Manager indemnifies Owner); or (iii) any other occurrence related to the Hotel or Manager's duties under this Agreement (except those for which Manager indemnifies Owner).  Owner may apply the proceeds of any available insurance to the payment of any claim under the indemnity set forth in this Section 16.1.  The provisions of this Section 16.1 shall survive the expiration or termination of this Agreement and shall be binding upon Owner's successors and assigns.  The Manager Indemnitees shall not invoke this indemnity for anything to the extent covered by insurance or where the aggregate amount of the Manager Indemnitees' loss is less than five-thousand dollars ($5,000).

Section 16.2.    Indemnification by Manager.  Manager hereby indemnifies, defends and holds harmless Owner, and its Affiliates and each of their respective officers, directors, shareholders, employees, representatives and agents (collectively, the "**Owner Indemnitees**") from and against any and all actual losses, costs, damages, liabilities, claims, demands, actions and causes of action, and expenses whatsoever (including,

without limitation, reasonable attorneys' fees and court expenses), incurred by Owner Indemnitees as a result of (i) the fraud, willful misconduct or gross negligence of Manager and Manager's employees, and (ii) any action taken by Manager which is beyond the scope of Manager's authority under this Agreement. Manager may apply the proceeds of any available insurance to the payment of any claim under the indemnity set forth in this Section 16.2. The provisions of this Section 16.2 shall survive the expiration or termination of this Agreement and shall be binding upon Manager's successors and assigns. The Owner Indemnitees shall not invoke this indemnity for anything to the extent covered by insurance or where the aggregate amount of the Owner Indemnitees' loss is less than five-thousand dollars ($5,000).

Section 16.3.    No Successor Liability.    Notwithstanding anything herein to the contrary, neither Manager nor its Affiliates shall be liable as a successor employer or entity for any actions Owner may have taken in the employer-employee relationship with Owner's current or former employees or employees of Owner's Affiliates or any previous manager of the Hotel before the Effective Date. Specifically, Manager shall not be liable or responsible in any manner for, and Owner shall indemnify and hold Manager harmless from, any and all pending claims, lawsuits, actions (administrative or judicial), and unasserted claims or causes of action arising out of Owner's ownership or operation of the Hotel, or employment of employees at the Hotel prior to the Effective Date.

## ARTICLE XVII
## MISCELLANEOUS

Section 17.1.    Severability.    Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Laws, but if any provision of this Agreement shall be prohibited by or invalid under applicable Laws, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 17.2.    No Waiver.    The failure of either party to insist upon strict performance of any of the terms or provisions of this Agreement or to exercise any option, right or remedy herein contained, shall not be construed as a waiver or as a relinquishment for the future of such term, provision, option, right or remedy, but the same shall continue and remain in full force and effect. No waiver by either party of any term or provision hereof shall be deemed to have been made unless expressed in writing and signed by such party.

Section 17.3.    Agency.    The relationship of Owner and Manager shall be that of principal and agent. Nothing contained in this Agreement shall be construed to create a partnership or joint venture between them or their successors in interest. Neither party shall borrow money in the name of, or pledge the credit of, the other. Manager's agency established by this Agreement is coupled with an interest and may not be terminated by Owner except in accordance with the terms hereof.

Section 17.4.    Consents.    Any and all disputes and litigation arising in connection with this Agreement shall be heard in a state court of appropriate jurisdiction in Lee County, Florida.

Section 17.5.    Mediation.    Prior to the filing of any litigation by any parties to this Agreement against the other parties of this Agreement (and, except as described below, as a precondition to any such filing), the parties shall engage in pre-suit mediation. Such mediation may be requested by either party, at any time, and shall be conducted the same as if such mediation were ordered by a Florida Circuit Court (i.e., in accordance with, and subject to, all of the laws and rules applicable to court-ordered mediation). Such mediation shall be conducted within a reasonable period of time after the same is requested in writing by either party. If the parties are unable to agree upon the selection of a mediator, either party may petition or request that the Circuit Court in Lee County, Florida (or the Mediation Coordinator for the Court of Lee County Florida) appoint a mediator. A mediator who is so appointed may only be challenged for cause, and not preemptorally. While the request for and the conducting of such a mediation may be a precondition to the

filing of a civil action, in the event either party is in jeopardy of losing its right to sue (e.g., the statute of limitations is about to expire), then suit may be filed before a mediation is conducted provided that mediation is requested before, or simultaneously with the filing of such suit, and is conducted before the named defendant in the suit is required to respond to the complaint. If the scheduling of the mediation requires, the plaintiff in the suit shall grant the defendant an appropriate extension of time to respond to the complaint so as to permit the mediation to be conducted before the defendant must so respond. The mediation contemplated hereunder shall be conducted, unless otherwise agreed by the parties, in Lee County, Florida. The parties shall bear the mediator's fee and any filing fees associated with the mediation equally.

Section 17.6.    Attorneys' Fees.  In connection with any litigation arising out of this Agreement, the prevailing party shall be entitled to recover all costs incurred, including a reasonable attorneys' fee.

Section 17.7.    Successors Bound.  This Agreement shall be binding upon and inure to the benefit of Owner and Manager, and each party's successors and permitted assigns.

Section 17.8.    Notices.  Notices, statements and other communications to be given under the terms of this Agreement shall be in writing and personally delivered or sent by certified or registered mail or by Federal Express or other similar overnight mail service to the address for each party set forth below or at such other address as from time to time is designated by either party in writing.  Notices, demands and requests which shall be served upon either party in the foregoing manner, shall be deemed served or given for all purposes hereunder at the time such notice, demand or request shall be personally delivered or received.

> To Owner:
> c/o Core States Realty Group, LLC
> 1010 Stony Hill Road, Suite 315
> Yardley, PA  19067
> (267) 759-5000
>
> To Manager:
> 13041-2 McGregor Blvd.
> Fort Myers, FL  33919
> (239) 481-2011

Section 17.9.    Entire Agreement.  This Agreement constitutes the entire Agreement between the parties relating to the subject matter hereof and supersedes all prior understandings and writings, and may be amended only by a written agreement signed by the parties hereto.

Section 17.10.    References.  Unless specifically noted otherwise, all references to any article, section, subsection, exhibit, recital or other provision are references to articles, sections, subsections, exhibits, recitals, or other provisions in this Agreement.

Section 17.11.    Time.  Time is of the essence with respect to this Agreement.

Section 17.12.    Financing of Hotel.

(a)    Owner shall not represent in any proposed financing arrangement or to any proposed lender or participant in a private or public investment offering that Manager, or any of its Affiliates, are or shall be in any way responsible for Owner's obligations under such financing arrangement, nor are or shall be participating in the offering; nor shall Owner in any way make use of the name of Manager in connection with any proposed financing arrangement to any lender or participant in an offering, other than to state that the Hotel will be managed by Manager pursuant to the terms of this Agreement.

(b)    In order to insure Owner's full and faithful compliance with this Section 17.10 and to prevent any misunderstanding on the part of a proposed lender or investor, Manager and Owner agree as follows:

(1)    Prior to the closing of any proposed financing arrangement, Owner shall notify Manager of such arrangement, and Manager shall have the right to notify the proposed lender of the legal relationship between Manager and Owner and to inform the lender that neither Manager nor any of its Affiliates make any representations or warranties in connection with any information provided to it by Owner.

Section 17.13.    Trade Names.  Trade names, trademarks and service marks of both Manager and Owner may be used by either party in connection with the management and operation of the Hotel during the term of this Agreement, on the condition that neither party shall thereby acquire any right to such name or mark.  Upon termination of this Agreement, each party shall discontinue using any such names and marks of the other in the conduct of its business, and shall not intentionally engage in any business or advertising practice that could lead the public to believe that there is any continuing relationship, affiliation or identity with Manager or Owner as to the Hotel.

Section 17.14.    Third Parties.  No obligation of either party hereunder shall be enforceable by any person or entity other than the parties hereto.

Section 17.15.    Further Instruments.  The parties shall execute and deliver all other appropriate agreements and instruments as may reasonably be required to give effect to the transactions contemplated hereby.

Section 17.16.    Arbitration.  Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by the AAA in accordance with its applicable rules; provided that either Owner or Manager can within sixty (60) days of the commencement of the arbitration stay such arbitration by commencing and diligently prosecuting litigation when the amount being sought reasonably is expected to exceed in the aggregate $100,000.  The arbitration shall allow discovery consistent with the discovery rules under the Federal Rules of Civil Procedure.  The arbitration shall be conducted by a single arbitrator or a panel of three arbitrators with at least ten years experience in the hotel industry, appointed in accordance with the rules of the AAA or as otherwise agreed in writing by Manager and Owner at the time of such dispute.  The prevailing party shall be awarded reasonable costs and expenses, including without limitation, attorneys' fees.  The award of the arbitrator(s) shall be final and binding upon the parties, and any judgment on the award rendered by the arbitrator(s) may be entered in any court have jurisdiction thereof.

Section 17.17.    Counterparts.  This Agreement may be executed simultaneously in various counterparts, each of which shall deemed an original, and all of which together shall constitute one and the same instrument.

Section 17.18.    Estoppel Certificate.  Owner and Manager shall, upon request of the other party, each deliver an estoppel certificate relating to this Agreement in form and substance reasonably satisfactory to the requesting party.

Section 17.19.    Applicable Law.  This Agreement shall be governed by the laws of the State of Florida.

**[SIGNATURES APPEAR ON FOLLOWING PAGE]**

- 28 -

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

OWNER:

By: _____

Name: __William T. Spiropoulos_____

Title: __MANAGER_____

_SANIBEL SUNDIAL PARTNERS, LLC_

MANAGER:

By: _____

Name: _____

Title: _____

## EXHIBIT A

### LEGAL DESCRIPTION OF REAL PROPERTY

### TO BE SUPPLIED UNDER SEPARATE COVER

## EXHIBIT B

### INSURANCE COVERAGE

Manager shall at all times keep the Hotel insured with the kinds and amounts of insurance described below, provided that Owner will assist if Manager cannot obtain such insurance and Owner may choose to place such insurance itself, if it has the ability to do so and notifies Manager. Manager shall utilize a competitive bid process when selecting all insurance. This insurance shall be written by companies authorized to issue insurance in the state in which the Hotel is located and holding a current Best's rating of at least A-VI. Upon inception of this Management Agreement and annually thereafter, certificates of insurance shall be deposited with Owner at the address of its corporate office. The insurance coverages on the Hotel, including the improvements, fixtures and Owner's personal property, shall include:

(i)     Real and personal property insurance on the "Special Causes of Loss Form" (formerly "All Risk" form) (including earthquake and flood in reasonable sublimits and deductibles as determined by Owner) and including operation of building laws/increased cost of construction and debris removal endorsements, in an amount not less than 100% of the full replacement cost thereof (as defined below), with all coinsurance waived;

(ii)    Boiler and Machinery Insurance, including business interruption and extra expense on an actual loss-sustained basis, with all coinsurance waived, in the minimum amount of five-million dollars ($5,000,000), or in such greater amounts as are then customary or as may be reasonably requested by Owner from time to time;

(iii)   Business Interruption and Extra Expense insurance, insuring Special Causes of Loss perils on an actual loss sustained/gross earnings basis, with all coinsurance waived, and with an extended period of indemnity of at least 180 days;

(iv)    Commercial general liability insurance, (ISO - 1986 or broader) with limits of not less than ten-million dollars ($10,000,000) each occurrence and general aggregate, including Liquor Law Liability Insurance;

(v)     Insurance covering such other hazards and in such amounts as may be customary for comparable properties in the geographic area of the Hotel as may be reasonably requested by Owner;

(vi)    A blanket Fidelity bond with a limit of at least one-hundred thousand dollars ($100,000), and a deductible of no more, than thirty-five thousand dollars ($35,000), or as may be reasonably requested by Owner;

(vii)   Statutory Workmen's compensation insurance and at least $500,000/$500,000/$500,000 Employer's Liability Insurance;

(viii)  Business Automobile liability insurance for "All Autos" with a limit of not less than one-million dollars ($1,000,000) for each accident;

Responsibility for Premiums. Owner may elect, as provided in Section 11.1, to itself provide and keep in force, at its own expense, the insurance coverages required under (i), (ii) and (iii) above except to the extent that the premium or premiums relate to coverages for property owned by the Manager. Manager shall keep in force, at Owner's expense, all other insurance coverages described above.

Replacement Cost. The term "full replacement cost" as used herein shall mean the actual replacement cost of the Hotel without regard to depreciation. In the event Owner believes that full replacement cost (the then-replacement cost less such exclusions) has increased or decreased at any time, it shall have the right to have such full replacement cost re-determined.

Waiver of Subrogation. All property insurance policies carried by Manager or Owner shall expressly waive any right of subrogation on the part of the insurer against the other parties.

Form Satisfactory, etc. All of the policies of insurance referred to in this Exhibit B shall be written in a form and with deductibles satisfactory to Owner. Manager shall pay all of the premiums as agent of Owner, as an Operating Expense out of funds in the Agency Account, relating to insurance coverages required to be obtained by Manager and deliver certificates thereof to Owner prior to their effective date and annually thereafter. In the event of the failure of Manager either to effect such insurance as herein called for or to pay the premiums therefore, or to deliver such certificates thereof to Owner at the times required, Owner shall be entitled, but shall have no obligation, to effect such insurance and pay the premiums. Each insurer mentioned in this Exhibit B shall agree, by endorsement to the policy or policies issued by it, that it will give to Owner at least 30 days written notice before the coverage under such policy or policies in question shall be allowed to expire or be cancelled.

Increase in Limits. If Owner at any time deems the limits and/or retentions of the coverages outlined in Exhibit B then carried to be either excessive or insufficient, Owner and Manager shall endeavor in good faith to agree in writing on the proper and reasonable limits for such insurance to be carried and such insurance shall thereafter be carried with the limits and/or retentions thus agreed on until further change pursuant to the provision of this Exhibit B.

Blanket Policy. Notwithstanding anything to the contrary contained in this Exhibit B, Manager or Owner may bring the insurance provided for herein within the coverage of a so-called blanket policy or policies of insurance carried and maintained by Manager or Owner; provided, however, that the coverage afforded to Manager and Owner will not be reduced or diminished or otherwise be different from that which would exist under a separate policy of insurance, and provided further that the requirements of this Exhibit B are otherwise satisfied.

Separate Insurance. Manager shall not on Manager's own initiative or pursuant to the request or requirement of any third party, take out separate insurance or increase the amount of any then existing insurance by securing an additional policy or additional policies, unless all parties having an insurable interest in the subject matter of the insurance, including in all cases Owner, is included therein as insured, and the loss is payable under such separate additional insurance in the same manner as losses are payable under this Agreement. Manager shall immediately notify Owner in writing that Manager has obtained any such separate insurance or of the increasing of any of the amounts of the then existing insurance.

Reports on Insurance Claims. Manager shall promptly investigate and make a complete and timely written report to the appropriate insurance company as to all accidents. Claims for damage relating to the ownership, operation, and maintenance of the Hotel, any damage or destruction to the Hotel and the estimated cost of repair thereof shall be prepared by Manager. Manager shall prepare any and all reports required by any insurance company as required under the terms of the insurance policy involved, and a final copy of such report shall be furnished to Owner and the Association. Manager shall be authorized to execute proofs of such loss, in the aggregate amount of twenty-five thousand dollars ($25,000) or less, with respect to any single casualty or other event.

**EXHIBIT C**

**OPERATING BUDGET REQUIREMENT**

Each Operating Budget shall include the following information for the then forthcoming Fiscal Year:

(1)     A detailed operating budget and forecast of operations, including Manager's reasonable estimate (by month) of Gross Revenue and Operating Expenses, itemized in a detailed, line item manner, together with the assumptions (in narrative form) forming the basis of such schedules;

(2)     a comparison of such Operating Budget against the approved annual Operating Budget for the immediately preceding Fiscal Year, which must be reasonable given the relevant market conditions;

(3)     a description of a compensation plan for all Hotel employees, including any proposals for the introduction or modification of employee benefit plans;

(4)     a description of the current status of pending claims, suits, actions, proceedings, inquiries or investigations concerning the Hotel;

(5)     a separate estimate (by month) of the Base Management Fee and the Incentive Fee and all other payments to Manager and its Affiliates;

(6)     a narrative description of the program for advertising the Hotel for the forthcoming Fiscal Year containing a detailed budget itemization of the proposed advertising expenditures by category and the assumptions, in narrative form, forming the basis of such plans;

(7)     a narrative description of the general plan for sales and marketing of the Hotel for the Fiscal Year, including, among other things, sales and marketing strategy, advertising and promotional activities, pricing strategy, customer relations policy and complimentary rooms policy and an estimate of all costs thereof, rate, pricing, market penetration, marketing and advertising budgets by market segment, major events plans, trade show participation and the positioning of the Hotel in the local market place; and

(8)     such other information as may be reasonably requested by Owner.

## EXHIBIT D

### FORM OF UNIT RENTAL MANAGEMENT AGREEMENT

### TO BE SUPPLIED UNDER SEPARATE COVER

# EXHIBIT B

Mr. Edward McGahan
Vice President
CoreStates Realty Group, LLC
1010 Stoney Hill Road
Yardley, PA 19067

This engagement letter will confirm our understanding of the services that Mariner Management Services, LLC ("Advisor") will provide to Sanibel Sundial Partners, LLC ("Company"). As we discussed, the Company is seeking to retain a financial advisor to assist the company in its recapitalization efforts. At present, Advisor's role will be advisory only. The current Manager, CoreStates Realty Group, LLC will continue to manage and be solely responsible for the operation of the Company. Should this role change as a result of a mutual agreement, reached after both the Company and Advisor have had an opportunity to work together and evaluate the scope of services needed, any such changes as may be necessary will be addressed in a supplemental or revised agreement.

**Scope of Services:** Pursuant to this engagement, Advisor will work with the Manager with respect to the following "Services":

A. Review Company status and provide recommendations as to the recapitalization strategy of the business

B. Rebuild Company accounting records and systems

C. Assist in the development and evaluation of Company cash flow projections and liquidity needs

D. Assist in the development and evaluation of strategic and financial options for the Company

E. Assist the Company in assessing creditor issues and negotiating, as needed, with creditors

F. Assist the Company, if needed, in developing restructuring options including a sale of the Sundial property

G. Provide advisory services to the Company in developing a Plan of Reorganization, if applicable

H. Perform such other tasks as may be agreed to by Advisor and the Company

Services will be provided by Allen G. Ten Broek, Thomas O. Matthews, and Robert M. Taylor.

**Fees:**  In consideration for the Services provided, Advisor will earn an hourly fee equal to $300 per hour for the services of Thomas O. Matthews, and $500 per hour for the services of Allen G. Ten Broek and Robert M. Taylor.  Other resources, if needed, will be billed at the agreed upon rates depending on the nature of services and experience level of the resource.  These fees will be discounted 50% by Advisor in support of current Company cash flow constraints.  Full fees will be restored upon mutual agreement of Company and Advisor.

Travel time will be made as productive as possible and will be billed at 50% of the hourly rates stated above.

Company will reimburse Advisor directly for all travel and out-of-pocket expenses incurred in connection with this agreement.

**Billings:**  Advisor will bill for Services monthly in arrears based on billable hours incurred.  Payment will be made monthly based on presentation of an invoice detailing time spent and work performed.

**Effective Date and Termination:**  This agreement will be effective May 1, 2013.  Either party may terminate this agreement effective immediately upon written notice to the other party.

**Warranties and Disclaimers:**  Advisor disclaims all representations and warranties, whether express, implied or statutory, including, but not limited to any warranties of quality, performance, merchantability, or fitness of use or purpose.  Without limiting the foregoing, Advisor makes no representation or warranty with respect to the Services provided hereunder, and will not be responsible for any action taken by Company in following or declining to follow any advice or recommendations.  The Services provided hereunder are for the sole benefit of the Company and not any unnamed third parties.  The Services will not constitute an audit, review, opinion, or compilation, or any other type of financial statement reporting or attestation engagement that is subject to the rules of the AICPA or other similar state or national professional bodies or laws and will not result in an opinion or any form of assurance on internal controls.

**Limitation of Liability; Indemnity:**

a) Advisor's liability in any and all categories and for any and all causes arising under this agreement, will, in the aggregate, not exceed the actual fees paid by Company to Advisor over the previous one month of the agreement from when the liability arises.  In no event will Advisor be liable for incidental, consequential, punitive, indirect or special damages, including, without limitation, interruption or loss of business, profit or goodwill.

b) Company agrees to indemnify Advisor to the full extent permitted by law for any losses, costs, damages, and expenses (including reasonable attorneys' fees), as they are incurred, in connection with any cause of action, suit, or other proceeding arising in connection with the services provided to Company,

provided, however, the Company shall not be responsible for indemnification for any loss arising from acts of bad faith, gross negligence, or intentional misconduct.

**Company Circumstances:**  The Company acknowledges to Advisor that, as of the date of this agreement, it is engaged in financial difficulties.  As a result, the Company may need to consider reorganization or liquidation in bankruptcy.  Although Advisor will endeavor to assist the Company in finding alternatives to bankruptcy, Advisor offers no assurances that the Company can otherwise be restructured or that the Company's distressed condition can be reversed.

**Governing Law, and Witness Fees:**

a) This agreement will be governed by and construed in accordance with the laws of the State of Florida.

b) In the event Advisor is requested or authorized by Company or is required by government regulation, subpoena, or other legal process to produce documents or appear as witness in connection with any action, suit, or other proceeding initiated by a third party against Company or by Company against a third party, Company will, so long as Advisor is not a party to the proceeding in which the information is sought, reimburse Advisor for its professional time as follows: $300 per hour for Thomas O. Matthews and $500 per hour for Allen G. Ten Broek and Robert M. Taylor – subject to discounts upon agreement between Company and Advisor, as well as expenses and reasonable fees and expenses of its counsel, incurred in responding to such requests.  This provision is in addition to and not in lieu of any indemnification obligations the Company may have under this agreement.

**Miscellaneous:**

a) This agreement constitutes the entire agreement between the parties with regard to the subject matter hereof and supersedes any and all agreements, whether oral or written, between the parties with respect to its subject matter.  No amendment or modification to this agreement will be valid unless in writing and signed by both parties.

b) Company may not assign its rights or obligations under this agreement without the express written consent of Advisor.  Nothing in this agreement will confer any rights upon any person or entity other than the parties hereto and their respective successors and permitted assigns.

c) The expiration or termination of this agreement will not destroy or diminish the binding force and effect of any of the provisions of this agreement that expressly, or by reasonable implication, come into or continue in effect on or after such expiration or termination, including, without limitation, provisions relating to payment of fees and expenses (including witness fees and expenses and liquidated damage fees), governing law, arbitration, limitation of liability and indemnity.

d) Company agrees to reimburse Advisor for all costs and expenses incurred by Advisor in enforcing collection of any monies due under this agreement, including, reasonable attorneys' fees.

Mariner appreciates the opportunity to serve the Company and believes this agreement accurately reflects the mutual understandings of the terms upon which the Services will be provided. If the foregoing is in accordance with your understanding, please sign a copy of this agreement and return it to my attention.

Sincerely,

Robert M. Taylor
Managing Member
Mariner Management Services, LLC

Concurred,

Edward McGahan III
Vice President
CoreStates Realty Group, LLC
Manager
Sanibel Sundial Partners, LLC